David M. Friedman (DF-4278)
Robert M. Novick (RN-4037)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
*COUNSEL TO GABRIEL CAPITAL L.P.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| | : | Chapter 11 Case Nos. |
| In re: | : | 98-B-47996 (REG) |
| | : | 98-B-47997 (REG) |
| URBAN COMMUNICATORS PCS LIMITED | : | 98-B-10086 (REG) |
| PARTNERSHIP, et al., | : | |
| | : | Jointly Administered |
| Debtors. | : | |

------------------------------------------------------------- x

## NOTICE OF APPEAL

   Gabriel Capital L.P. ("Gabriel"),  pursuant to 28 U.S.C. § 158(a), hereby appeals to the

United States District Court for the Southern District of New York from the *Decision and Order*

*on Gabriel Entitlement to Post-Petition Interest* (the **"Order"**) entered in the above-captioned

chapter 11 cases on December 11, 2007.  A copy of the Order is annexed hereto as **Exhibit A**.

The parties to this appeal and their respective counsel are:

<u>Appellant and Counsel</u>

Gabriel Capital L.P.

Kasowitz, Benson, Torres & Friedman LLP
*Attorneys for Gabriel Capital L.P.*
1633 Broadway
New York, New York 10019
(212) 506-1700
Attn: David M. Friedman
      Robert M. Novick

<u>Appellees and Counsel</u>

The Debtors:   Urban Communicators PCS Limited Partnership
                Urban Comm-Mid-Atlantic, Inc.
                Urban Comm-North Carolina, Inc

Windels Marx Lane & Mittendorf, LLP
Counsel for the Debtors
156 West 56th Street
New York, NY 10019
(212) 237-1070
Attn:  Charles E. Simpson, Esq.

Date:  December 20, 2007
       New York, New York

                                    KASOWITZ, BENSON, TORRES
                                       & FRIEDMAN LLP

                                   <u>/s/ Robert M. Novick</u>
                                   David M. Friedman (DF 4278)
                                   Robert M. Novick (RN 4037)
                                   1633 Broadway
                                   New York, NY 10019
                                   Tel:  (212) 506-1700
                                   Fax:  (212) 506-1800

                                   *Attorneys for Gabriel Capital L.P.*

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Urban Communicators PCS Limited | ) | Case No. 98-B-47996 (REG) |
| Partnership, *et al.*, | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

DECISION AND ORDER ON GABRIEL
ENTITLEMENT TO POST-PETITION INTEREST


APPEARANCES:

WINDELS MARX LANE & MITTENDORF, LLP
Counsel for Urban Communicators PCS Limited Partnership, *et al.*
156 West 56th Street
New York, NY 10019
By:    Charles E. Simpson, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for Gabriel Capital L.P.
1633 Broadway
New York, NY  10019-6799
By:    David M. Friedman, Esq.
       Robert M. Novick, Esq.


BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE

In this contested matter in these jointly administered chapter 11 cases, secured

creditor Gabriel Capital L.P. ("Gabriel") seeks the allowance of post-petition contractual

interest on its claim.  After an earlier hearing in April 2005, this Court issued an oral

ruling determining that Gabriel held a fully secured claim.  Therefore, this Court held,

under section 506(b) of the Bankruptcy Code, Gabriel was entitled to post-petition

interest, and at a rate no less than the 15% base contract rate. But the Court reserved

decision as to (i) whether Gabriel was also entitled to an incremental 4% in default

interest on its secured claim; (ii) whether provisions of the loan documents gave Gabriel

interest on unpaid installments of interest, which would effectively result in compounding

of the unpaid interest;[1] and (iii) whether (and the extent to which) the Court should give

Gabriel *both* of the foregoing, when doing so would result in a very high level of

interest—the equivalent of a simple interest rate of approximately 38%, over the 11 years

since the money was borrowed.

   With respect to those three issues,[2] as to which the Court took supplemental

briefing, the Court determines that Gabriel does indeed have contractual entitlements

(i) to default interest at an incremental rate of 4% over the base rate (which would boost

its contractual entitlement from 15% to 19%); and (ii) to interest on unpaid installments

of interest—boosting Gabriel's contractual entitlement further to a simple interest

equivalent of approximately 38%. But then applying usury limitations and making the

equity determination that has been regarded as necessary and appropriate under

bankruptcy caselaw, the Court determines that these considerations weigh against

enforcement of both the default contractual rate and the compounding provisions at the

same time, to the extent that the resulting interest would exceed the 25% interest rate set

forth under New York's criminal usury statute.

---

[1]  Both sides seem to agree that if the contractual provisions did in fact provide for interest on interest, they would effectively provide for the compounding of interest, and the Court will often refer to "compounding" as a shorthand for those provisions.

[2]  The Court's earlier determination that Gabriel is oversecured—and that Gabriel would have to be paid its post-petition interest before the Debtors' Equity could get the excess value in the estates that otherwise would exist—remains unchanged. *See* Part I below.

Though the Court would not be averse to enforcing a default interest rate increase of 4% if the Court were faced with such a rate increase in isolation (and believes that the 4% increment and resulting 19% rate would be acceptable in most solvent commercial debtor situations),[3] compounding on the 19% default interest rate—with a resulting 38% simple interest equivalent—results in a rate that exceeds the highest rate that has ever been approved in any reported bankruptcy case. More importantly, an award at that level would make at least some of the Debtors insolvent (prejudicing unsecured creditors), and exceed the 25% per annum interest rate provided for under New York's criminal usury statute. Here (in the absence of aggregation, which the Court regards as inappropriate), a simple interest equivalent in excess of 25% on the $8 million first Note would at least seemingly not constitute criminal usury, but interest at that level on the $1 million New Note and other notes issued by the Debtors in favor of Gabriel would exceed criminal usury limits. For these reasons and others, the Court believes that in the exercise of its equitable power, the Court should award Gabriel its contractual entitlements, but then limit them to the extent that the interest award would exceed the 25% per annum maximum for which New York's criminal usury statute provides.

Thus the Court rules that Gabriel's secured claim should accrue interest at the default rate, 19%, compounded at the quarterly intervals that interest payments became due, but that the award must then be capped at a 25% per annum simple interest equivalent.

---

[3]     The Court expresses no view as to whether such a rate would be acceptable in the context of a consumer loan agreement, especially one that might be a contract of adhesion or otherwise include terms dictated by the lender.

The following are the Court's Findings of Fact, Conclusions of Law, and bases

for the exercise of its discretion with respect to its earlier oral ruling[4] and the remaining

issues taken under submission.

<u>Findings of Fact</u>

The facts relevant to this controversy were undisputed, and there was no need for

an evidentiary hearing.

*A.  The Debtors*

In October and November 1998, Urban Communicators PCS Limited Partnership

("UC-LP"), Urban Comm-Mid-Atlantic, Inc. ("UC-MA"), and Urban Comm-North

Carolina, Inc. ("UC-NC") (collectively, the "Debtors") filed voluntary petitions under

chapter 11 of the Bankruptcy Code.  UC-NC is a wholly owned subsidiary of UC-MA,

which in turn is a wholly owned subsidiary of UC-LP.  UC-LP's limited partnership

interests are owned by a variety of non-debtors.

---

[4]    The Court issued a partial ruling at the close of the April 7th Hearing, stating:

> I'm ruling today that if the sale proceeds as planned consistent
> with the terms of the stipulation, Gabriel will be fully secured
> and that the extent of its oversecured status should be
> measured in the light of and at the time of the sale transaction,
> consistent with the Fourth Circuit's holding in *Ford Motor
> Credit* and the Ninth Circuit BAP's holding in *Alpine*.

April 7th Hrg. Tr. at 75 (Italicization of case names added; those cases discussed in Part I below).
The Court went on to say that:

> I believe that the matters of the secured status are so
> straightforward and, frankly, so easy, that I can tell you with
> certainty that there will be no change in that decision.
> However, I will give a more extensive discussion of the
> underpinnings of that at the same time as I address the open
> issues, following which there will be a single written opinion
> with respect to all of the issues....

*Id.* at 75-76.

*B. Background*

      In 1993, Congress amended the Federal Communications Act to authorize the FCC to license available radio wave spectrum by an auction process. The FCC divided the available spectrum into six blocks, designated as "A" through "F," and entities would bid in an auction process to win the licenses. A bidder would have to post a bid deposit to enter the bidding, and if it were the auction winner it would then have to post a purchase deposit equal to 10% of its successful bid. The remaining 90% of the bid purchase price would have to be paid to the FCC on an installment basis, and with respect to the amount yet to be paid on the bid, the FCC would be a creditor of the successful bidder, and not just a regulator.

      Debtor UC-LP was the successful bidder with respect to 10 C-Block licenses, and thereafter assigned its rights as successful bidder, with the FCC's consent, to Debtor UC-NC. UC-LP had financed the bid deposit with a loan from an entity not involved in the present dispute, which loan was later subordinated to the Gabriel loan that is the subject of this controversy.

*C. The Gabriel Loan*

      After UC-LP's successful bid and UC-LP's assignment of rights to UC-NC, UC-NC then financed the 10% down payment UC-NC would have to make, borrowing $8 million from Gabriel. The Debtors did so by entering into a note purchase agreement (the "Note Purchase Agreement") with Gabriel, dated August 12, 1997, pursuant to which UC-NC sold to Gabriel a 15% senior note (the "Original Gabriel Note"), due one year later, in the principal amount of $8 million. Under the Note Purchase Agreement, the interest rate to apply in the event of default was originally 17%.

-5-

The other Debtors UC-LP and UCMA guaranteed UC-NC's obligations, and each of the three Debtors granted Gabriel a security interest, to the extent permitted by law, in all of their tangible and intangible personal property.[5] Debtors UC-LP and UC-MA likewise granted Gabriel security interests, by means of pledge agreement, in their equity interests in UC-MA and UC-NC, respectively. In addition to obtaining the pledges, Gabriel filed UCC-1s to perfect its security interests, and the fact that Gabriel duly perfected the security interests it holds is now undisputed.

### D. Grant of the Licenses by the FCC

In September 1996, a few weeks after the Original Gabriel Note had been executed, the FCC announced that UC-NC had been conditionally granted the licenses, and a few weeks later, the FCC provided UC-NC with the documents UC-NC would have to execute with respect to UC-NC's debt to the FCC on the 90% yet to be paid. Those documents included promissory notes for the $67.2 million unpaid balance, and a security interest in favor of the FCC in the licenses. By May 1999, when the FCC filed a proof of claim in these cases, the debt due to the FCC had grown, by the FCC's computation, to approximately $80 million.

At least in the Debtors' view,[6] by December 1996, when the licenses were finally issued and UC-NC executed the FCC notes, delays in issuing the licenses, subsequent

---

[5]     The "to the extent permitted by law" qualification mattered because it was at least arguable that an entity could not grant a security interest in an FCC license. But apparently without dispute, it could grant a security interest in the *proceeds* of a sale of such a license.

[6]     The Court makes no finding, one way or the other, as to the accuracy of the Debtors' views in this respect. It is well aware, as noted at greater length below, that similar drops in license value were major elements in bankruptcy and plenary cases involving other bidders for similar FCC licenses—including, most notably, those in the *NextWave* cases, discussed below. In the *NextWave* bankruptcy case, for example, Judge Hardin of this Court found, as a fact, that the value of NextWave's licenses dropped from $4.7 billion to approximately $1.0 billion. *See In re NextWave Personal Commc'ns, Inc.*, 235 B.R. 305 (Bankr. S.D.N.Y. 1999). But for the purposes of the analysis that follows, it is sufficient to assume that the value of the Debtors' licenses dipped

-6-

auctions of competing blocks of spectrum, and other circumstances had reduced the value of UC-NC's licenses to less than 13% of the amount for which they had been auctioned months earlier. Putting it another way, the Debtors' licenses, for which they had promised to pay the FCC $76 million, were then worth, at least in the Debtors' view, only $9.5 million.

E. *Restructuring of the Gabriel Loan*

As the Gabriel loan was about to come due, one year after it originally was made, the Debtors and Gabriel agreed on a restructuring of the Debtors' obligations to Gabriel. On August 12, 1997, the Debtors and Gabriel entered into an Amendatory Agreement (the "Amendatory Agreement") pursuant to which Gabriel would purchase from UC-NC, at par, a new 15% senior note due September 30, 1998 in the amount of $1 million (the "New Note"). Thus UC-NC's aggregate indebtedness to Gabriel was increased to $9 million, with the debt under each of the two notes to bear base rate interest at 15%. At this time, the Amendatory Agreement increased the rate at which interest would be charged after a default, increasing the default rate to the base rate plus 4%—*i.e.*, to 19%.

F.    *The Filing of the Debtors' Chapter 11 Cases*

In April 1998, the FCC issued an order requiring purchasers of C-Block and F-Block licenses to make the interest payments on account of their acquisition debt to the FCC on or before October 29, 1998. The FCC's order provided that if a purchaser did not make the required interest payment, its licenses would be automatically cancelled.

---

markedly—to a level below that sufficient to pay Gabriel in full—before that value later climbed to the level at which the licenses ultimately were sold.

On October 28, 1998, one day before the payment was due, UC-NC filed its chapter 11 case.[7]

G. *The NextWave Litigation*

The Debtors' difficulties with the FCC were very similar to those that were involved in the *NextWave* litigation, in this Circuit (after proceedings in the bankruptcy court in *NextWave*'s separate chapter 11 case in this district),[8] the D.C. Circuit,[9] and the United States Supreme Court.[10] The legal determinations in the *NextWave* litigation had the potential to (and ultimately did) provide a template for legal determinations involving the Debtors here, and the Debtors kept their chapter 11 case alive in this Court while the *NextWave* litigation went on. For the purposes of this decision, it is unnecessary to discuss the *NextWave* litigation in detail; it is sufficient to note that ultimately, the United States Supreme Court ruled in favor of *NextWave* and against the FCC, effectively undoing the two decisions in favor of the FCC and adverse to *NextWave* in the Second Circuit.

As a result of the Supreme Court's *NextWave* decision, in September 2003 the FCC issued an order in the parallel proceedings before the FCC involving the Debtors here, effectively undoing its cancellation or attempted cancellation of the Debtors' licenses.

---

[7]    The other two Debtors filed their chapter 11 cases on November 5, 1998, about a week later.

[8]    *See In re NextWave Personal Commc'ns, Inc.,* 200 F.3d 43 (2d Cir. 1999); *In re NextWave Personal Commc'ns s, Inc.,* 208 F.3d 137 (2d Cir. 2000).

[9]    *See NextWave Personal Commc'ns, Inc. v. FCC,* 254 F.3d 130 (D.C. Cir. 2001), *aff'd* 537 U.S. 293 (2003).

[10]   *See FCC v. NextWave Personal Commc'ns, Inc.,* 537 U.S. 293 (2003).

Thus the Supreme Court's rulings in the *NextWave* litigation provided a basis for the Debtors' retention of their licenses, for a consensual resolution of the FCC's claims here, and for the Debtors' subsequent sales of their licenses to third party purchasers for amounts that would ultimately be sufficient to pay off the FCC.

### H. Settlement with the FCC and Related Stipulation Between the Debtors and Gabriel

In the last quarter of 2004, the Debtors found third-party purchasers for certain of their licenses, Triton PCS (later to be known as SunCom Wireless) and Verizon Wireless, and filed motions for approval of the proposed sale agreements in October and December, 2004, respectively. Shortly thereafter, the Debtors settled their controversies with the FCC, and in March 2005 the Debtors and the FCC entered into a settlement agreement, subject to the Court's approval under Fed.R.Bankr.P. 9019. The 9019 motion came on for hearing on March 24, 2005. The desirability of the settlement, from both the Debtors' and the FCC's perspective, was obvious. But in connection with the approval of the settlement on that day, following its submission of a limited objection to the settlement, Gabriel expressed the desire to be heard on the allowability of its secured claim. Gabriel's concerns as to the FCC settlement were resolved by entering into a stipulation with respect to aspects of the Gabriel-Debtors controversy, and setting Gabriel's other issues down for a future hearing.

Thus, on the day of the March 24 hearing, the Debtors and Gabriel stipulated on the record that for the purposes of a separate claims allowance hearing that would follow, the Court should presume that:

-9-

(i) the Verizon Wireless and Triton sales would proceed toward closing that would provide consideration to the Debtors' estates (prior to any payments to the FCC) of $68.5 million and $113 million, respectively;

(ii) the claims of the FCC would be paid in the manner and amounts set forth in the FCC Settlement Agreement; and

(iii) the equity cushion created by the Verizon Wireless and Triton transactions upon the closing of those sales, net of the necessary payment to the FCC, would exceed the maximum amount claimed by Gabriel.

The Debtors and Gabriel also stipulated at that March 24 hearing that:

(iv) the Gabriel Claims were not less than approximately $11.134 million (which they referred to as the "Principal Amount"), and the Debtors did not object to the Gabriel Claims in the principal Amount; and that

(v) the Debtors would not assert an entitlement to a section 506(c) entitlement.

Shortly thereafter, the Court entered separate orders approving the FCC settlement, and "providing related procedural relief" with respect to a hearing on the allowance of Gabriel's claim, including memorializing the stipulations that had been made on the record on March 24.

*I. Sales of the Licenses*

Also in the first quarter of 2005, this Court approved the sales by the Debtors of certain of their licenses to Verizon Wireless and Triton. The Verizon Wireless sale closed in 2005, but the Triton sale ultimately failed to close. From the sale proceeds

-10-

remaining after the required payment to the FCC on the deal that did close (*i.e.*, the Verizon Wireless sale), approximately $20 million was paid to Gabriel. The Debtors retained the remainder of the sale proceeds and used them pursuant to a cash collateral order, discussed below.

By an agreement dated March 1, 2006, UC-NC sold other Licenses to Cricket Licensee (Reauction) Inc. Upon closing of this transaction, the Debtors paid Gabriel an additional $1.8 million on account of Gabriel's claim amount.

By order dated August 9, 2006, the Court approved terms for still another sale by UC-NC to Verizon Wireless—this time of the remaining licenses held by the Debtors. The parties agree that the cash proceeds of this second sale to Verizon Wireless, together with the proceeds from the Debtors' earlier sales (all after payment of the FCC's senior secured debt), exceed the amount of the Gabriel claims, except when incorporating the highest level of post-petition interest demanded by Gabriel.

In short, in the event this Court were to award less than the maximum amount claimed by Gabriel, there would be enough cash left in the Debtors' estates to pay their unsecured claims (which are the only other claims in the case, and which are very modest in relation to the secured debt), and to fund a distribution to equity. The Debtors only face insolvency if, and only if, Gabriel's claim is calculated based upon a 38% post-petition interest rate.

*I. Cash Collateral Orders*

After cash proceeds started coming in from the sales of the Debtors' licenses, this Court entered two cash collateral orders. Each of the first, entered in December 2005, and the second, entered in December 2006, was a stipulation between the Debtors and

-11-

Gabriel that was "so ordered" by this Court, and allowed for the Debtors to use a portion of the cash proceeds retained from the various sales of the licenses.

Each of the cash collateral orders contained an express acknowledgment by the Debtors that the Amendatory Agreement provides that "the Prepetition Principal Amount shall bear interest in the amount of fifteen percent (15%) per annum in the absence of the occurrence of any event of default [and] that upon the occurrence of an event of default, the interest rate shall increase to nineteen percent (19%) per annum, compounding quarterly."

*J. Payments to Gabriel on Account of its Secured Claim*

Pursuant to this Court's April 4, 2005 order and its April 7, 2005 bench decision ruling that the Gabriel claims are secured (and oversecured), the Debtors have distributed cash to Gabriel in the amount of Gabriel's "Minimum Claim amount"—an amount equal to Gabriel's prepetition claim (principal and interest), plus post-petition interest computed as simple interest at the 15% non-default rate—except for approximately $1.3 million of interest and fees that was not paid due to a computational error.

Discussion

I.

Whether Gabriel Is Oversecured

Preliminarily, the Court confirms and amplifies upon its oral decision in April 2005, determining that Gabriel was oversecured.

The Debtors argued in 2005, and still argue, that although Gabriel at one time was secured, Gabriel ceased to remain such, by reason of the drop in the value of the licenses that were a major component of Gabriel's collateral, and/or the now-undone cancellation

-12-

of the licenses. Thus, the Debtors argued and still argue, Gabriel lost its secured status, and likewise was not and is not oversecured.

The Court disagreed in April 2005, and still disagrees.[11] The Court considers the Debtors' arguments in the context of the unquestionable reality that the licenses were restored, thereafter climbed in value, and fetched actual prices sufficient to pay Gabriel in full except at the outer limits of Gabriel's demands. The decision was and is straightforward in light of the language of section 506, the caselaw, and the commentary.

As relevant here, section 506(b) of the Code provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section,[12] is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.[13]

Section 506(a), which immediately precedes section 506(b), speaks to the extent to which a claim has the benefits of a secured claim:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in such property …

---

[11] In a recent submission to the Court, the Debtors suggested that the Court "preliminarily ruled" on this issue, surrounding those words with quotes, as if the Court's ruling at that time were some kind of musing or tentative decision. That decidedly was not the case. The Court's decision on this issue came at that time and in that fashion only because it was so easy.

[12] That subsection is inapplicable here. The Debtors waived their right to seek a surcharge under this section.

[13] The language of section 506(b) that is quoted, like that of the language of section 506(a) that is quoted next, is the language that is applicable in these pre-BAPCPA cases.

-13-

The collective effect of these two provisions was to make Gabriel's claim a fully secured claim to the extent that Gabriel's collateral was of a value equal to or greater than its contractual entitlement, and to make Gabriel eligible for post-petition interest.

Then, in connection with determining the *value* of the secured creditor's "interest in such property"—*i.e.*, the collateral securing its claim—section 506(a) goes on to provide:

> Such value shall be determined in light of the purpose of the valuation and the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Though section 506(a) is silent in prescribing a particular time as of which a secured creditor's collateral is to be valued, it speaks directly to matters to be considered in valuing the collateral. By section 506(a)'s express terms, the value of collateral is to be determined "in light of" (i) the purpose of the valuation, and (ii) the proposed disposition or use of the collateral.

Here the Court starts with consideration of the statutory criteria. The latter factor is perhaps best considered first. The "disposition or use" of such property was (and with hindsight still is) the eventual sale of that property for the benefit of the Debtors' creditors and equity. Then, the "purpose of the valuation" was in 2005 and still is the allowance of a secured creditor's claim. And in particular, the purpose is determining the extent to which the secured creditor should be able to collect its contractual entitlement from the proceeds of its collateral—for which the actual proceeds were the best measure of the collateral value—and where the secured creditor's lien attached to the proceeds.

-14-

This Court noted in its earlier oral ruling that it would follow decisions by the Fourth Circuit in *Ford Motor Credit Co. v. Dobbins*,[14] and by the Ninth Circuit BAP in *In re Alpine Group*,[15] each of which had squarely held that where collateral was actually sold during the pendency of the case (and where the terms of the sale were fair and arrived at on an arm's-length basis),[16] the actual sale price should be used to measure the property's value, as contrasted to some "earlier hypothetical valuation."[17] Each of *Ford Motor Credit* and *Alpine* was directly on point, deciding the exact question presented here, and applying a consistent rule irrespective of whether the collateral value, based on an actual sale, would be lower than an earlier estimate,[18] or higher.[19] At least on the facts here, there is no reason to depart from the Court's earlier reliance on those cases.

The decisions in *Ford Motor Credit* and *Alpine* were two of the appellate courts so to rule, but they were just the most prominent examples of a larger body of caselaw commentary so holding.[20] Those cases, especially when viewed with the other cases

---

[14]     35 F.3d 860, 869-871 (4th Cir. 1994) ("We hold that when secured collateral has been sold, so long as the sale price is fair and is the result of an arm's-length transaction, courts should use the sale price, not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest under § 506(b).").

[15]     151 B.R. 931, 935-936 (9th Cir. BAP 1993) ("Here, there was an actual sale. The offered price of $1.9 million is conclusive evidence of the property's value.").

[16]     The Court expresses no view as to whether this analysis would also apply if the sale of the Debtors' property had occurred in a foreclosure sale, where the collateral sale process may not always achieve the maximum value. Here the sales of the Debtors' licenses were conducted in a marketing process engaged in by the Debtors, and supervised by this Court.

[17]     *Ford Motor Credit*, 35 F.3d at 870.

[18]     *See Ford Motor Credit*, 35 F.3d at 869.

[19]     *See Alpine*, 151 B.R. at 935.

[20]     *See, e.g., In re Two "S" Corp.*, 875 F.2d 240, 243 (9th Cir. 1989) ("Evidence of other appraised values is also irrelevant, because the sale price is a better indicator of the asset's value than any estimate of value given prior to the sale. The bankruptcy court properly found that, under the facts of this case, the value was conclusively determined by the sale price."); *In re Toy King Distributors, Inc.*, 256 B.R. 1, 191 (Bankr. M.D. Fl. 2000) ("In circumstances where the collateral has been sold, courts generally determine the secured status of the claim on the date of sale for the purpose of allowing the secured claim and determining the creditor's entitlement to interest and

holding similarly, strongly support—if they do not also compel—the conclusion that, at least for the purposes we have here, the Court should consider the *actual* value received on the sale of the collateral, and not an estimated alternative figure for collateral value, measured at an earlier time. There is scant authority on the other side.[21] And the same conclusion was reached in *Collier*, which observed, with respect to contexts of the type we have here:

> Before addressing the application of section 506(a)…, it is important to point out that, regardless of the purpose of the valuation, if an actual sale (or equivalent disposition) is to occur, the value of the collateral should be based on the consideration to be received by the estate in connection with the sale, provided that the terms of the sale are fair and were arrived at on an arm's-length basis.[22]

The Debtors have offered up no caselaw holding, or suggesting, that *Ford Motor Credit* and *Alpine* were incorrectly decided, or that the reasoning in *Collier* should be rejected. The most they can say is that a bankruptcy court making a valuation decision, like the one this Court must make here, has some flexibility in making its determination.

---

attorney's fees, provided that the sale price is fair and the result of arms-length negotiation."); *In re Mitchell*, 81 B.R. 171, 173 (Bankr. D.D.C. 1988) ["[T]he maximum amount allowable to [the secured creditor] under sections 502(b)(2) and 506(b) is the net sales price …."]; *In re Kids Stop of America, Inc.*, 64 B.R. 397, 401 (Bankr. M.D. Fla. 1986) ("If there is to be a disposition of the property, then the valuation of the collateral should be based on the funds received from the disposition so long as the disposition is commercially reasonable.").

[21]  One case rejecting the *Alpine* approach, *Whalley v. American Insurance Co. (In re Whalley)*, 202 B.R. 58 (Bankr. W.D. Pa. 1996), chose not to follow *Alpine* on the facts before it, reasoning that *Alpine* was driven in material part by a concern that it would be inequitable for a debtor to reap the benefit of an increase in the value of the subject property subsequent to the filing of the bankruptcy petition. *See id.* at 62 n. 3. But the *Whalley* court distinguished the facts before it from such a situation, and significantly observed that "[i]f this were the case—i.e., that debtor would reap the benefit of these factual occurrences rather than his creditors—we might join in this [the *Alpine*] determination."

[22]  *See* 4 *Collier on Bankruptcy* ("*Collier*") ¶ 506.03[6][b] at 506-43 (15th Ed. Rev. 2007).

In support of that, the Debtors cite the Fifth Circuit's holding in *In re T-H New Orleans Ltd. P'ship*.[23] In *T-H New Orleans*, the court addressed the issue of whether it must utilize a fixed date, such as the petition date or the date of plan confirmation, for the purposes of valuing secured collateral to determine whether a creditor is entitled to post-petition interest under section 506(b). The Fifth Circuit concluded that under section 506(b), courts should employ a "flexible approach" that is not moored to any single point in the bankruptcy process.[24]

This Court agrees that bankruptcy courts have flexibility in determining entitlements to post-petition interest, including in situations like this one where the entitlements turn on determinations as to collateral value. Recognition of that flexibility is, after all, consistent with attention to the needs and concerns of junior creditors, and, more significantly, language in section 506(a) that bankruptcy courts engage in any analysis of collateral value "in light of the purpose of the valuation and the proposed disposition or use of such property." The statutory guidance appearing as part of section 506(a) is the antithesis of a hard-and-fast rule, and instead embodies a more functional approach. But acknowledging, as this Court does, that a bankruptcy court has flexibility in making a collateral valuation decision does not mean that the Court should disregard the best evidence of collateral value—what the collateral actually fetched. Rather, that flexibility should permit this Court's resort to the best available evidence of collateral value except where the circumstances dictate a different approach. And the Court must also note the context in which the Fifth Circuit in *T-H New Orleans* made the observations upon which the Debtors rely. This flexible approach, the Fifth Circuit

---

[23]     116 F.3d 790 (5th Cir. 1997).

[24]     *Id.* at 798-799.

noted, ensures that "any increase over the judicially determined valuation during the bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor."[25]

Importantly, in *T-H New Orleans*, there had not been an actual sale of the underlying secured asset. In this case, as in *Ford Motor* and *Alpine*, the secured asset has been sold in a good faith and arm's length transaction. This distinction is critical. It is settled law that the sale price in an arm's length transaction is the best evidence of an asset's market value.[26] *T-H New Orleans* does not disturb this conclusion. While this Court endorses the "flexible approach" outlined in *T-H New Orleans,* the Court believes that in instances where an actual post-petition sale of a secured asset has occurred, the flexibility provided to bankruptcy courts is usually best employed by utilizing the sale price in a good faith transaction as the value of a secured asset—and that in any event, such an approach is the most sensible here.

In this context, the Court notes that upon the sale of each bundle of licenses, Gabriel's lien transferred to the proceeds of the sale of its collateral. Acceptance of the Debtors' contentions would result in the anomalous result that Gabriel's lien attached to a pot of money sufficient to pay Gabriel in full or in major part, yet would be limited to a lesser sum, as a consequence of an alternative theory for collateral valuation.

The Debtors' final argument in 2005 posited that, regardless of when this Court determined would be the appropriate time to measure whether Gabriel is oversecured, the Court had to conclude that Gabriel was not oversecured during the nearly five years when the Licenses were cancelled by the FCC. The Debtors argued that throughout the period

---

[25]    *Id.* at 798.

[26]    *See, e.g., Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value.").

-18-

between October 29, 1998 and September 23, 2003, during which the Licenses had been cancelled by the FCC, Gabriel could not possibly accrue post-petition interest because the only property to which Gabriel's lien attached was no longer part of the estate.  This argument was, and remains, without merit.

As the Court noted in its oral decision, Gabriel had liens on more than the licenses themselves.  Gabriel also had liens on the proceeds of its earlier collateral; on the Debtors' causes of action against the FCC; and on the capital stock of the Debtors' subsidiaries.  During the period that the FCC unlawfully cancelled the Debtors' rights to the Licenses, the Debtors maintained litigation rights against the FCC for this wrongful cancellation, whose value is now apparent.  And Gabriel maintained collateral rights to the proceeds of the licenses.  Of course it is true that during the period in which the licenses were cancelled and the *Nextwave* litigation was ongoing, it was highly uncertain as to whether there might be any proceeds.  But the Debtors preserved the litigation rights that would ultimately give value to proceeds collateral, and brought their own legal proceedings, in parallel with those involving *NextWave*, to keep their own rights alive. To ignore Gabriel's other species of collateral would be to deny Gabriel that aspect of the benefit of its bargain, and give the Debtors' junior creditors and equity a windfall.

\*\*\*

Finally, by notice of supplemental authority, the Debtors cite a very recent decision by the Ninth Circuit, that involving *MagnaCom Wireless*,[27] issued a few weeks ago, as a basis for the reversal by the Court of the determination it made in 2005.  But *MagnaCom*, while likewise involving the FCC's termination of wireless radio licenses of

---

[27]     *Thacker v. FCC (In re MagnaCom Wireless, LLC)*, 2007 U.S. App. LEXIS 22151 (9th Cir. Sept. 17, 2007).

a debtor that was in many respects similarly situated, differs from this case in significant respects, and does not change the Court's conclusions here.

In *MagnaCom*, the debtor there had similarly bid for, and won, C-Block and F-Block licenses in an FCC auction. Like the Debtors here, the *MagnaCom* debtor had a duty to pay the FCC over time for the licenses it had bid for and won, and defaulted on those obligations. And there, as in the Debtors' cases here, the FCC had similarly cancelled the *MagnaCom* debtor's licenses, and the issues involved the rights of the debtors, the FCC and others in the aftermath of the FCC's actions, which, after the Supreme Court's decision in *NextWave*, turned out to be unlawful. But at that point, material differences appear.

In *MagnaCom*—which, it should be emphasized, was an adversary proceeding to recover money from the *FCC*, and had nothing to do with the allowance of a secured claim—a chapter 7 trustee tried to recover from the FCC for amounts that the FCC had realized after the FCC had cancelled the debtor Magnacom's licenses, and then auctioned off new licenses in the band where the debtor's licenses had been. But the trustee had failed to challenge the FCC's cancellation of the debtor's licenses. The Ninth Circuit held that in light of the trustee's failure to challenge the FCC's cancellation,[28] and the fact that the proceeds were not from the sale of the same licenses,[29] the chapter 7 trustee did not have any entitlement to proceeds received by the FCC after the FCC had canceled the *MagnaCom* debtor's FCC licenses and auctioned out new licenses in the same spectrum bands.

---

[28] *Id.* at *15.

[29] *Id.* at *17-*18.

Significantly, and unlike in the instant case, *MagnaCom* did not involve the rights of a secured creditor—whether having a lien on the proceeds of sales of licenses, a lien on litigation rights, or otherwise. To the contrary, the *MagnaCom* court's decision turned, in significant part, on the FCC's cancellation of MagnaCom's licenses, and the FCC's issuance of *new* licenses, in which MagnaCom (and hence its chapter 7 trustee) had no interest.[30] It recognized that if the FCC had sold Magnacom's licenses, the MagnaCom estate might have had rights to the proceeds from such a sale,[31] but noted that Magnacom's licenses had not been sold, but rather were cancelled, and that the proceeds came from the sale of *different* licenses.[32]

Though the Debtors here, consistent with the rules applicable to submissions of supplemental authority, did not write at length on *MagnaCom* or specific portions of that decision that might help them, they may have been thinking of a sentence in *MagnaCom* that "Magnacom's property—the licenses—were extinguished and had no value once they were cancelled by the FCC."[33] That may have been true in *MagnaCom*, but was not

---

[30]  Significantly also, an agreement between MagnaCom and the FCC expressly provided that MagnaCom would not be entitled to any proceeds from the sale of new licenses following cancellation. It provided, in relevant part:

> Debtor hereby acknowledges the Commission's authority ... to conduct another public auction or assign the License in the event that the Commission rescinds, cancels, or revokes the License for any default under this Agreement .... Debtor further acknowledges that in the event that the Commission rescinds, cancels, or revokes the License for any default under this Agreement ... Debtor has no right or interest in any moneys or evidence of indebtedness given to the Commission by a subsequent licensee of the Spectrum and that all such moneys or evidence of indebtedness are, and shall remain, the full property of the federal Treasury ....

*Id.* at *6-*7.

[31]  *Id.* at *18.

[32]  *Id.* at *27.

[33]  *Id.* at *18.

true here, where the Debtors acted vigorously to protect their property, and where there efforts ultimately bore fruit. It also is the case that in *MagnaCom*, where the debtor-in-possession and trustee had forfeited their litigation rights against the FCC (and where there was no secured creditor of the estate with an interest to protect), the Ninth Circuit had no occasion to consider what would happen if an estate preserved its rights to secure the return of its licenses, as the Debtors successfully did here, and later was able to secure their restoration and convert its licenses into cash proceeds of substantial value.

In short, *MagnaCom* says nothing about the rights of a secured creditor in proceeds of its collateral where that collateral has been successfully sold. *MagnaCom* does not change the earlier result. Though the sale of the Licenses is the appropriate time at which the extent of Gabriel's oversecured status is determined, Gabriel's lien on both the Debtors' capital stock and litigation rights dictates that Gabriel was oversecured from the petition date, including the pendency period of the FCC's unlawful cancellation of the Licenses. Any collateral appreciation here must accrue to the benefit of the secured creditor, not the debtor or equity holders.[34] As a result, the ultimate increase in collateral value will entitle Gabriel to earn post-petition interest on its oversecured claim.

## II.

### Contractual Entitlements

Gabriel argues that the Amendatory Agreement (like the Note Purchase Agreement, which was superseded by the Amendatory Agreement) provides for the

---

[34]     *See Dewsnup v. Timm*, 502 U.S. 410, 417 (1992) ("Any increase over the judicially determined valuation during the bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor …").

-22-

quarterly compounding of interest,[35] in each of the pre- and post- default phases. Gabriel further contends that in the post-default phase, the interest rate increased, by express agreement, by 4%—thereby increasing the base contract rate (before consideration of compounding) to 19%. Before considering the extent to which any contractual entitlements are enforceable under applicable usury laws or in bankruptcy (or must be reduced under one or another of them), the Court turns first to what the parties' agreements say.

*A. Pre-Default*

Each of the original Note Purchase Agreement (which ultimately covered only the period from August 1996 to August 1997) and the Amendatory Agreement (which superseded the original Agreement for periods thereafter) called for the payment of interest quarterly in arrears, in cash, in November, February, May and August.[36]

But each of the original Note Purchase Agreement and the Amendatory Agreement went on to say that in the absence of an event of default, each quarterly interest payment (other than the interest payment due on maturity) could be paid by an additional note in the principal amount equal to the amount of the quarterly interest payment. Any such additional note would have "the same terms as the Note."[37] The two agreements used largely similar language, though the Amendatory Agreement added,

---

[35]   Compound interest has been defined as "interest paid on both the principal and previously accumulated interest." *See* 72 N.Y. Jur. 2d Interest § 2. New York statutory law defines "compound interest" in a manner that includes "interest on interest" whether or not it is added to principal. *See* N.Y. General Oblig. Law § 5-527(1) ("For the purposes of this subdivision, the term 'compound interest' shall mean the accruing of interest upon unpaid interest irrespective of whether such unpaid interest is added to the principal debt.").

[36]   *See* Note Purchase Agreement Section 1.04(b); Amendatory Agreement Section 2(c).

[37]   *See* Note Purchase Agreement Section 1.04(c); Amendatory Agreement Section 2(d).

after the "same terms," and before "as the Note," the significant words "including the interest rate."[38]

Section 1.04(c) of the Agreement and Section 2(d) of the Amendatory Agreement provided for what is colloquially called a "payment in kind" or "PIK" feature. In the non-default situation, interest on principal would not be paid in cash. Instead, new PIK notes would be issued in amounts equal to the interest that otherwise would have been paid in cash, and those new PIK notes would have the same interest rate provisions as the original note—thereby accruing interest on their principal, which in each case would have its origins as an interest obligation.[39]

And since each of the new PIK notes would have the same terms as the Note, each of the new PIK notes being issued quarterly would thereafter draw interest just as the original Note did. As a consequence, PIK notes issued after the first PIK note would have to be issued not just on the interest due on the original Note principal, but also covering the interest on any PIK notes issued before them.

This is in substance a compounding of interest. For the non-default period, to the extent interest for this period has not been previously paid, the Debtors must now pay

---

[38]    Thus the Amendatory Agreement provided in its Section 2(d):

> (d) Notwithstanding anything set forth herein to the contrary in subparagraph (c) of this Section 2 and provided there is no Event of Default, each Quarterly Interest Payment shall be paid (unless a Quarterly Interest Payment is due on the Maturity Date) by delivery to Purchaser of an additional Note in the principal amount equal to the amount of such Quarterly Interest Payment, each such additional Note having the same terms *including the interest rate* as the Note.[38]

The Court regards those extra words as significant not because they changed the meaning of the clause, but because they could only have been added for emphasis or for the avoidance of doubt.

[39]    The Court speaks with the conditional "would" because the record is muddy as to the number of PIK notes that were actually issued. They could have been issued up to the time of an Event of Default.

interest on the original Note principal, *and* on each PIK note that was issued. At the risk
of stating the obvious, to the extent that payment was not made on any of the PIK notes,
the PIK notes represent additional obligations that the Debtors must pay.[40]

*B. Post-Default*

       The applicable provisions differ with respect to the post-default period. The
Amendatory Agreement, in its Section 2(e), provides, in relevant part, that:

> The unpaid principal amount of the Note and the
> New Note upon the occurrence and during the
> continuance of an Event of Default, and, *to the*
> *extent permitted by law, overdue interest in respect*
> *of the Note and the New Note shall bear interest* at a
> rate *per annum* equal to the rate of interest
> applicable to the Note plus four (4%) percent.[41]

       Section 2(e) states unequivocally that the principal on the Note ($8 million) and
on the New Note ($1 million more) each draw interest at the "rate applicable to the Note"
(15%) plus 4%—*i.e.*, at 19%. It also states that overdue interest "in respect of the Note,"
though "to the extent permitted by law," likewise draws interest at the same rate. The
expressions "overdue interest" and "in respect of the Note" (and New Note) are not as
precise as the remainder of Section 2(e), but especially when read with the clause "to the
extent permitted by law," they signal to the Court an intention to award compound

---

[40]    The Court's interpretation in this regard is further bolstered by provisions in the Amendatory
Agreement, in which the parties computed the interest that was due as of the one-year anniversary
of the original Agreement, at August 12, 1997. At that time, they agreed that the interest due after
that one-year was $1,248,024. If the Agreement had drawn only simple interest as of that time,
the amount due would have been only $1,200,000—the product of $8 million principal x 15% per
annum x 1 year.

[41]    *See* Amendatory Agreement, § 2(e) (underlining in original; emphasis by italics added). In this
respect the Amendatory Agreement superseded the Agreement, whose Section 1.04(d) had
provided, in relevant part, that upon an event of default, the unpaid principal amount of the Note
and "to the extent permitted by law, overdue interest in respect of the Note" would bear interest at
a rate 2% higher than the base rate on the Note.

interest on any interest that was not currently paid—by collecting interest on overdue interest if, but only to the extent, such were permitted by law.

The issues then devolve into the *frequency* of compounding, and the extent to which the resulting interest, after compounding, would be permitted by law. Upon review of the Note Purchase Agreement and Amendatory Agreement, the Court is persuaded that, subject to usury and bankruptcy law limits, compounding is indeed an element of the parties' agreement, and that compounding at neither a more frequent rate (*e.g.*, monthly), or less frequent rate (*e.g.*, annually), would be appropriate. As discussed above, in the non-default situation, new PIK notes were to be issued at quarterly intervals, and these notes, when issued, would each bear interest on the same terms (specifically including interest) as in the original Note. Thus, as a practical matter, interest would compound quarterly. Likewise, in the post-default situation, interest was similarly due on a quarterly basis,[42] and to the extent permitted by law, interest was due on overdue interest.[43]

The Court's finding that the parties contracted for quarterly compounded interest after an event of default is buttressed further, and indeed is compelled, by the two Cash Collateral Stipulations, so ordered by this Court, entered into at a time when the Debtors already were in default. At each of the two times those stipulations were entered into, the Debtors *expressly stipulated* that the Amendatory Agreement provided that "upon the occurrence of an event of default, the interest rate shall increase to nineteen percent (19%) per annum, *compounding quarterly*."[44]

---

[42]    Amendatory Agreement Section 2(c).

[43]    Amendatory Agreement Section 2(e).

[44]    The first stipulation provided, in full relevant part:

-26-

The Court does not need to determine whether the Debtors are judicially estopped from denouncing their stipulations. It can and does infer that the parties entered into them with a full understanding of their earlier agreement—an understanding that is fully consistent with the plain meaning of the Amendatory Agreement's words.

Accordingly, the Court rules that except to the extent that the parties' agreement may be trumped by usury limitations or principles of bankruptcy law or equity, Gabriel has an entitlement to interest at the default rate of 19% for the post-default period,[45] and that this interest entitlement is compounded quarterly.

---

THE DEBTORS REPRESENT AND STIPULATE, AND THE UNDERSIGNED CREDITOR STIPULATES THAT:

...

C.  The Indebtedness to Gabriel.

...

b. Subsequently, it became clear to the Debtors that they would be unable to meet all of their obligations to Gabriel under the 1996 Financing Agreements, including repayment of the Senior Note when due. Consequently, on or as of August 12, 1997, Gabriel and the Debtors agreed on terms for a restructuring of the Debtors' obligations to Gabriel under the 1996 Financing Agreements. The restructuring agreements (the "1997 **Financing Agreements**"; together with the 1996 Financing Agreements, the "**Financing Agreements**") included the following:

i. An Amendatory Agreement (the "**Amendatory Agreement**") pursuant to which the Debtors and Gabriel amended the Note Purchase Agreement to provide, among other changes: ...(c) *that upon the occurrence of an event of default, the interest rate shall increase to nineteen percent (19%) per annum, compounding quarterly.*

Stipulation and Order Authorizing Use of Collateral and Providing Adequate Protection, So Ordered Dec. 28, 2005, at 2-4 (Capitalization, underlining and bold face in original; emphasis by italics added). *Accord* Second Stipulation and Order Authorizing Use of Collateral and Providing Adequate Protection, So Ordered Dec. 20, 2006 at 2-4.

[45]  Section 2(e) of the Amendatory Agreement provides for the imposition of default interest "upon the occurrence and during the continuance of an Event of Default." Section 2(e) does not condition that upon the lender giving *notice* of an Event of Default. All agree that an Event of Default took place at least at the time UC-NC filed its chapter 11 petition. But in its supplemental briefing, Gabriel argued for a number of pre-bankruptcy alleged Events of Default, or possible

-27-

## III.

### Usury Limitations

As it appears, without dispute, that if Gabriel recovered the full interest it seeks, it would receive the simple interest equivalent of a very high 38% per annum on its loan, the Court necessarily must focus on usury considerations, both as a matter of state law entitlement and as affecting the discretion the has in awarding pendency interest in a bankruptcy case. The Court considers the former concerns here.

Each of the Note Purchase Agreement (unchanged by the Amendatory Agreement) and its form of Promissory Note provided that it was subject to New York law.[46] New York statutory law imposes usury limitations of two types, civil and criminal, which emerge from the combination of New York's General Obligations Law and Penal Law. New York's usury statute, General Obligations Law § 5-501, provides for an exception to its civil usury provisions—which would otherwise prohibit interest even at the 19% level, and before compounding—for commercial loans of more than $250,000.[47] But here the principal of each of the two original notes, $8 million and

---

Events of Default, under a variety of theories, encompassing most or all of the enumerated Events of Default under Section 7 of the Amendatory Agreement. The Court finds sufficient evidence in the record for one earlier Event of Default, but only one—the payment default that took place when all of the indebtedness became due on August 12, 1998, and all or most of the indebtedness admittedly was not then paid. Though it had ample opportunity to do so, Gabriel introduced insufficient evidence of any other Events of Default, and its reservations of rights to introduce further evidence as to these, after taking discovery, were not a satisfactory substitute for proof.

[46]    *See* Agreement Section 11.07, Agreement Exh. A (Promissory Note) at 2.

[47]    *See* N.Y. General Oblig. Law § 5-501(6)(a). It provides, in relevant part:

No law regulating the maximum rate of interest which may be charged, taken or received, except section 190.40 and section 190.42 of the penal law, shall apply to any loan or forbearance in the amount of two hundred fifty thousand dollars or more, other than a loan or a forbearance secured primarily by an interest in real property improved by a one or two family residence.

-28-

$1 million respectively, plainly exceeds that threshold, as does the principal on the PIK notes and, indeed, each of the interest installments that was not evidenced by a promissory note.

New York also has a criminal usury statute, Penal Law § 190.40, which subject to exceptions that are applicable here, in part, makes it unlawful to extend credit at an interest rate higher than 25%.[48] But the General Obligations Law has an additional provision providing in substance that no law regulating the maximum rate of interest which may be charged, *including Penal Law § 190.40*, shall apply to loans in the amount of $2.5 million or more.[49]

The principal of the original Note was $8 million, and it thus was exempted from criminal usury limitations under General Obligations Law §5-501(6)(b). But the principal amount of the New Note was only $1 million, and it was not required as a supplemental advance under the original Note Purchase Agreement. Thus the New Note did not fall within another potentially applicable exception provided for under General Obligations Law §5-501(6)(b),[50] and the New Note was subject to criminal usury law

---

[48]    N.Y. Penal Law § 190.40 provides:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

[49]    *See* N.Y. General Oblig. Law § 5-501(6)(b). It provides, in relevant part:

> No law regulating the maximum rate of interest which may be charged, taken or received, including section 190.40 and section 190.42 of the penal law, shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more.

The effect of the difference between General Oblig. Law §§ 5-501(6)(a) and (b) is that commercial loans between $250,000 and $2.5 million are subject to criminal, but not civil, usury constraints.

[50]    N.Y. General Oblig. Law §5-501(6)(b) goes on to provide:

limits. Similarly, the PIK notes also fell below the statutory threshold for exemption from usury limits.

General Obligations Law §5-501(6)(b) permits aggregation of principal installments agreed to be made in advance, but does not authorize aggregation with respect to interest accruals. Thus, as a matter of state law, the $8 million Note was exempt from criminal usury limitations, but the $1 million New Note and the PIK notes were not.[51]

The simple interest equivalent yield on the original Note could lawfully exceed 25% as a matter of New York State usury law, but the yield on the other obligations could not. As a matter of state law, Gabriel's claim must be reduced to that extent.

## IV.

### Recoverability in Bankruptcy

As previously noted, section 506(b) of the Bankruptcy Code creates a statutory exception to the general rule prohibiting the accrual of interest on claims after a bankruptcy petition has been filed.[52] It provides for the award of post-petition interest to the holder of a secured claim to the extent that the collateral value is sufficient to pay the post-petition (sometimes referred to as "pendency") interest. Section 506(b) reads:

> Loans or forbearances aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower *in one or more installments pursuant to a written agreement* by one or more lenders shall be deemed to be a single loan or forbearance *for the total amount which the lender or lenders have agreed to advance* or make pursuant to such agreement on the terms and conditions provided therein.

(Emphasis added.)

[51] That does not mean, of course, that any part of this transaction was unlawful. Amendatory Agreement section 2(e) provided that the interest on overdue interest on the Note and the New Note would be at a rate per annum of 19%, "to the extent permitted by law." That provided for an automatic correction of the interest rate to lower it to lawful limits.

[52] *See* § 502(b); *see also In re Foertsch*, 167 B.R. 555 (Bankr. D.N.D. 1994).

> To the extent that an allowed secured claim is
> secured by property the value of which ... is greater
> than the amount of such claim, there shall be
> allowed to the holder of such claim, interest on such
> claim, and any reasonable fees, costs, or charges
> provided for under the agreement under which such
> claim arose.

Plainly, then, Gabriel as the holder of an oversecured claim is entitled to payment

of post-petition interest, in some amount, up to the amount of its equity cushion in the

collateral. But the *rate* at which that interest must be paid is more debatable.

In the Supreme Court's well known decision in *United States v. Ron Pair

Enterprises*,[53] the Court held that the United States, a holder of an oversecured

nonconsensual tax lien, was entitled to post-petition interest on its claim, even though the

tax lien holder's interest entitlement did not come from an underlying agreement.  The

Court did not then address what *rate* of interest applied under such circumstances.[54]  But

in its analysis, the Court reasoned that the clause "interest on such claim" in section

506(b) was not modified by the later clause in that subsection, separated by a key comma,

"provided for under the agreement under which such claim arose."[55]

That led to the conclusion in *Ron Pair* that in order to be recoverable as post-

petition interest, interest need not be authorized "under the agreement under which such

claim arose," or any agreement.  But if the clause "under the agreement under which such

claim arose" does not modify "interest" for that purpose, it follows that the clause does

---

[53]    *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989).

[54]    *See Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 74 (5th Cir. 1992).  *See also 4 Collier*
¶ 506.04[2][b] (*Ron Pair* "did not explicitly resolve the question of the appropriate *rate* to be
applied.") (emphasis in original).

[55]    *See Ron Pair*, 489 U.S. at 241-242.  *See also 4 Collier* ¶ 506.04[2][a] ("the Court in *Ron Pair*
reasoned that the reference to an 'agreement' in section 506(b) only modified the reference to
reasonable fees, costs or charges, and not to the accrual of interest").

-31-

not modify it for other purposes either—including specifying the *rate* at which post-petition interest must be awarded.

Nevertheless, "the great majority of courts to have considered the issue since *Ron Pair* have concluded that post-petition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose—the so-called 'contract rate' of interest."[56] Most courts, including this Court, have agreed with *Collier*'s observation that "[i]n general, the better view is that the relevant rate is to be established in the contract (if any), or otherwise applicable nonbankruptcy law."[57] Consequently, without any exception that it can recall, this Court has always awarded post-petition interest at the contract rate to oversecured creditors in any case where the secured creditor was fortunate enough to be oversecured. But this Court has done so because it is a *general rule*—and the right thing to do most of the time—with the recognition that it is not always required.

The Second Circuit has read *Ron Pair* as this Court does. In its well-known *Milham* decision,[58] the Circuit noted that "section 506(b) does not say that the oversecured creditor collects pendency interest at the contractual rate."[59] The *Milham* court went on to explain the holding in *Ron Pair*, and observed, as did this Court, that the phrase "provided for under the agreement under which such claims arose" does not

---

[56]     4 *Collier* ¶ 506.04[2][b][i].

[57]     4 *Collier* ¶ 506.04[2][b].

[58]     *Key Bank National Ass'n v. Milham (In re Milham)*, 141 F.3d 420 (2d Cir. 1998) (*per curiam*) ("*Milham*").

[59]     *Id.* at 423

modify the phrase "interest on such claim."[60] Thus, the Second Circuit observed in *Milham*, "[u]nlike prepetition interest, pendency interest is not based upon contract."[61]

The Circuit went on to rule that "[t]he appropriate rate of pendency interest is therefore within the limited discretion of the court."[62] And it concluded:

> Most courts have awarded pendency interest at the
> contractual rate; but nevertheless, however
> widespread this practice may be, it does not reflect
> an entitlement to interest at the contractual rate.[63]

In exercising their discretion to depart from the general practice of awarding pendency interest at the contract rate, courts have looked to equitable considerations, most commonly the effect on junior creditors if pendency interest were awarded to the full extent that the contractual documents would suggest,[64] and how high the resulting interest award would be if the contractual documents were mechanically followed.[65] In that connection, they have often cited the Supreme Court's well known decision in *Vanston Bondholders*,[66] which, while superseded in the respects that section 506(b) provides, has never otherwise been legislatively or judicially overruled. There the Supreme Court considered a situation different in its specifics from the one before the

---

[60]    *Id.*

[61]    *Id.*

[62]    *Id.*

[63]    *Id.* Gabriel's contends, on pages 14 and 15 of its 2007 brief, that it is "entitled" to "the full measure of interest provided under the terms of the Financing Agreements" because section 506(b) "unequivocally requires" such. And Gabriel does so again, twice, on page 18 of that brief, arguing that an award of compounded default rate interest is "required" by section 506(b), and underlining section 506(b)'s language in such a way as to suggest that "under the agreement" modifies "interest on such claim." Gabriel's presentation of those contentions is at best materially misleading, and the suggested conclusion is simply wrong. The contentions run exactly contrary to *Milham*, which as the quoted language from *Milham* makes clear, holds exactly the opposite.

[64]    *See infra* note 71.

[65]    *See infra* note 73.

[66]    *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946).

Court here, but conceptually very close—the extent to which post-petition "interest on interest" was properly allowable when its allowance would come at the expense of subordinate creditors.[67]  The Supreme Court disallowed the allowance of the extra interest, noting, *inter alia*, that:

> It is manifest that the touchstone of each decision
> on allowance of interest in bankruptcy, receivership
> and reorganization has been a balance of equities
> between creditor and creditor or between creditors
> and the debtor.[68]

Analysis of the balance of equities between "between creditor and creditor" calls for consideration of the effect of the secured creditor's interest demands on other creditors.  Analysis of the balance of equities between "creditors and the debtor" calls for consideration of the effect of the secured creditor's interest demands on the debtor itself, and, as *Vanston Bondholders* makes clear, is a separate and also permissible inquiry.

Once it is recognized that award of post-petition interest at the full contractual rate is not an entitlement,[69] and is instead a matter of the Court's discretion,[70] the Court turns to that discretionary determination.  Here three factors inform the exercise of the Court's exercise of its discretion on this motion—a discretion that ultimately leads the Court to award most of the contractual interest, but to reduce the simple interest equivalent from 38% to 25%.

---

[67]    *Id.* at 159.

[68]    *Id.* at 165.

[69]    *See Milham*, 141 F.3d at 423.

[70]    *Id.* The Court recognizes, as the *Milham* court stated, that this is a "limited" discretion. *Id.* The Court reads the "limited" qualifier as saying (and in any event believes) that any analysis of the post-petition interest entitlement would have to start with consideration of the contractual entitlement that would exist before consideration of equitable principles; that any reasons for departure from that "lodestar" amount must be articulated; and that the reasons for departure should have a basis in the facts, other equitable considerations that have historically been utilized, and/or any others that might appear from unique facts in the given case.

*Effect on Other Creditors*

The first is the effect on other, junior, creditors—a factor identified in *Vanston Bondholders* as the balance of equities between "creditor and creditor." In the instant case, permitting an interest recovery at the full 38% simple interest equivalent demanded by Gabriel would drive most or all of the Debtors into insolvency and impair the recoveries of junior creditors. That is a traditional basis for reducing a pendency interest award.[71]

*Very High Level of Interest Rate*

The second factor informing this Court's exercise of its discretion is the absolute level of the requested interest—relevant in cases, like this one, where the requested interest rate is very, very high, and relevant to the second *Vanston Bondholders* prong, the balance of equities between "creditor and the debtor." Courts typically have viewed this examination with an end to determining whether the rate amounts to a penalty or is usurious,[72] and very high interest rates, including those at this level, have repeatedly been held to be unenforceable.[73] So far as the Court can tell, the 38% simple interest

---

[71]   *See, e.g., Fisher Enterprises, Inc. v. Germeia (In re Kalian)*, 178 B.R. 308, 314-315 & n. 16 (Bankr. D.R.I. 1995) (court should take a "hard look" at post-petition interest entitlements particularly where estate is insolvent because prebankruptcy bargain can be enforced only at the expense of junior, usually unsecured, creditors) (citing cases); *In re Vest Assocs.*, 217 B.R. 696, 703 (Bankr. S.D.N.Y. 1998) ("A debtor's solvency is thus an important factor in determining whether default interest should be allowed."); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 551 (Bankr. S.D.N.Y. 1998) (Garrity, J.) ("Here, the debtor is solvent ... This distinguishes our case ... and favors permitting [the secured lender] to collect default interest on its over-secured loan.").

[72]   *In re Schaumberg Hotel Owner Ltd. P'ship*, 97 B.R. 943, 951 (Bankr. N.D. Ill. 1989); *cf. In re Presque Isle Apartments, L.P.*, 109 B.R. 687, 689 (Bankr. W.D. Pa. 1990).

[73]   *See, e.g., In re Hollstrom, D.C.*, 133 B.R. 535, 539-540 (Bankr. D. Colo. 1991) (36% default rate of interest was deemed a penalty and unenforceable); *Fisher Enterprises, Inc. v. Germeia (In re Kalian)*, 178 B.R. at 316-317 (refusing to enforce default rate of 36%); *In re DWS Investments, Inc.*, 121 B.R. 845, 849-850 (Bankr. C.D. Cal. 1990) (25% default rate of interest deemed penalty); *In re Boardwalk Partners*, 171 B.R. 87, 92-93 (Bankr. D. Ariz. 1994) (24% default rate

equivalent here exceeds the highest interest rate ever approved in a reported bankruptcy case.

Looking at the interest rate level here in absolute terms, and against a public policy benchmark, the 38% simple interest equivalent exceeds New York's 25% criminal usury level, with part of the underlying indebtedness (about 2/5 of it)[74] failing to satisfy the requirements for a statutory exemption and with the remainder (about 3/5 of it)[75] satisfying a statutory exception. Of course, the part that failed to satisfy the requirements for the statutory exemption could not be recovered in any event. But while the remainder would at least seemingly qualify for the exemption and pass muster under state law, that is not the end of the inquiry. The Court must now make a decision of federal law, and not state law.[76] In making its discretionary determination under federal law, the Court reads New York's 25% criminal usury provision as embodying an important public policy in the State of New York, and providing a benchmark for the Court's exercise of equitable discretion. Two courts sitting in New York in non-bankruptcy cases (with one being the district court in this district, and the other being at the Appellate Division level), each charged with determining the appropriate interest rate for notes to bear interest at the highest rate permissible under law, have relied on New York's criminal

---

of interest deemed penalty); *In re White*, 88 B.R. 498, 511 (Bankr. D. Mass. 1988) (48% default rate of interest was deemed a penalty and unenforceable).

[74]    *I.e.*, the Additional Note ($1 million), PIK note indebtedness through August 1997 of approximately $1.248 million, and up to three more PIK notes that either were issued or should have been, approximating another $940,000, for a total of principal indebtedness that would be separate from the original Note of approximately $3.19 million.

[75]    *I.e.*, the original Note ($8 million).

[76]    *See In re W.S. Sheppley & Co.*, 62 B.R. 271, 274 (Bankr. N.D. Iowa 1986) (While "appropriate regard" should be given to state law to determine whether a contractual default interest rate is a penalty as between the debtor and the secured party, the question "is in the last analysis a matter of federal law."); *see also In re Wonder Corp. of America*, 72 B.R. 580, 588 (Bankr. D. Conn. 1987), *aff'd* 82 B.R. 186 (D. Conn. 1988).

usury provision, and ruled that the highest permissible rate was 25%.[77]  In determining

what it should authorize here, this Court believes that it should rule similarly.

While Gabriel argues, fairly and appropriately, that the 19% interest rate is "well

within the realm of rates that other courts have found to be reasonable and non-

punitive,"[78] Gabriel fails to account for the extraordinary effect the quarterly

compounding has on that 19% rate of interest.  The issue is not the permissibility of an

interest award at the level of 19%; as previously noted, in this commercial loan context

where the Debtor would still be solvent if there were an interest award at the 19% level,

the Court finds that to be within acceptable limits.[79]  Nor is the issue the 4% spread

between the pre-default and post-default interest rates; this Court agrees with the holdings

in prior cases that a 4% contractual default rate increase is likewise generally within the

realm of acceptable limits.[80]  The issue is instead the compound interest boost to a 38%

simple interest equivalent—a result which this Court cannot bless.

*Unique Circumstances Here*

A third factor informs the Court's exercise of its discretion here, arising from

circumstances that may be unique to this case, and which, like the second factor, relate to

---

[77]    *See Bruce v. Martin*, 845 F.Supp. 146, 147, 150 (S.D.N.Y. 1994) (Sweet, J.) (ruling that notes, in unstated principal amount, bearing interest at "the highest rate legally permissible" should be capped at 24.9%); *Emery v. Fishmarket Inn*, 173 A.D.2d 765, 765, 570 N.Y.S.2d 821, 823, (2d Dep't 1991) (where note provided that "[f]ollowing a default, the mortgagee shall be entitled to the highest interest permitted under law," and referee awarded interest at the rate of 18% per annum, there was no basis for awarding a lower rate, as "[t]he 'highest interest permitted under law' is 25% per annum.").

[78]    Renewed Motion of Gabriel Capital L.P. for Allowance of Post-Petition Contractual Interest on its Oversecured Claim at ¶ 38

[79]    *See In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546 (finding a 22.8% interest rate to be acceptable).

[80]    *See In re Schaumburg Hotel Owner LP*, 97 B.R. at 943 (4.3% spread upheld); *In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. at 552 (8.8% spread upheld); *In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Cal. 1987) (4% spread upheld).

*Vanston Bondholders'* "balance of equities ... between creditors and the debtor."[81]  The

Debtors, and all of their stakeholders, suffered first by the actions of the FCC—by

regulatory action determined by the Supreme Court to have been unlawful.  But it took

lengthy litigation to obtain that determination.  The Debtors took the many steps

necessary to protect their interest in the licenses, in this Court and in proceedings

elsewhere—ultimately securing the value of the licenses in a process running on since

1998, nine years ago.  If the Debtors, bankrolled by the Debtors' equity, had not

continued that fight, Gabriel's collateral would be valueless, and Gabriel would have lost

the entirety of its $9 million principal, along with all of the interest it now seeks to

collect.  Under Gabriel's argument, Gabriel would be the only beneficiary of that lengthy

battle.

Recognizing that there is greater authority for adjustment of oversecured

creditors' post-petition interest allowances when junior creditors would be the victims,

this Court considered the possibility of awarding Gabriel pendency interest all the way up

to a level where the Debtors would touch insolvency but not go into it—so as to make the

Debtors' equity the sole victim.  The Court rejected such a notion.  Employing such an

approach would be extraordinarily unjust under the circumstances presented here.

Granting Gabriel an incremental recovery to achieve an even higher return, with the

effect of simultaneously denying any and all recovery to those who kept the fight alive,

and whose efforts bankrolled Gabriel's recovery, would be unconscionable.

The Court assumes that capping Gabriel's recovery at 25% per annum will leave

something left for equity.  But under the unusual facts here, and the Second Circuit's

---

[81]     329 U.S. at 165.

pronouncements in this area, the Court sees nothing unlawful, unjust, or that would be an abuse of its discretion in such a result.

***

The Court recognizes the wisdom, in many cases, of observations made by a judge this Court highly respects that "[b]eing guided by a judge's sense of what is fair under the circumstances ... may be a precariously slippery slope."[82] But *Milham*—binding precedent in the Second Circuit—expressly holds that interest at the contract rate is not an entitlement, and that a bankruptcy court has discretion on a determination of an oversecured creditor's entitlement to pendency interest. And where, as here, the Court is exercising discretion based on fairness to other creditors, New York statutory and case law and public policy, and other specifically articulated factors informing the exercise of its discretion, the Court believes that its "fairness" determinations are hardly free-form exercises of judicial preference or whim. They are, instead, examples of the focused inquiry that under *Milham* can be, and should be, conducted as an alternative to mechanical reliance on each of the contracts' terms.[83]

---

[82] *See Hepner v. PWP Golden Eagle Tree, LLC (In re K&J Properties, Inc.)*, 338 B.R. 450, 460 (Bankr. D. Colo. 2005).

[83] *In re Coney Island Amusement, Inc.*, 2006 WL 617979 (S.D.N.Y 2006) does not demand a different result. In that case, the court held that New York City could collect 18% post-petition interest on its secured tax lien, created pursuant to New York City administrative code. *Coney Island's* legal conclusions are consistent with those addressed here and its facts are clearly distinguishable from those in the instant case. The court in *Coney Island* gave due deference to "the equitable principles used by other courts to justify lowering the interest rate" but found, in light of the fact that New York could not as a tax lien holder bargain for lender protections, that the 18% statutorily required interest rate was not so high so as to serve as a penalty. And, of course, the 25% rate approved here is higher than the 18% approved in Coney Island, and the 38% disapproved here is *much* higher than the 18% found acceptable in that case. As discussed in detail above, the facts in this case clearly diverge from those in *Coney Island* and demand this Court, in the exercise of the equitable discretion *affirmed* by the court in *Coney Island*, to reach a different result.

-39-

<u>Conclusion</u>

For the foregoing reasons, the Court grants Gabriel's motion for pendency interest, allowing pendency interest to the extent its simple interest equivalent rate would not exceed 25% per annum.[84] The Court rejects the Debtors' contentions that Gabriel is entitled to less (and, of course, the Debtors' contention that Gabriel is entitled to nothing), and rejects Gabriel's contentions that it is entitled to more.

If there is disagreement as to the exact amount due by reason of this ruling (after giving due account to previous payments to Gabriel on account of its secured claim, and without prejudice to parties' rights to appeal this ruling), the parties are to confer, and if possible agree, on a mechanism and schedule for the submission of evidence and briefs on the open issues. But the time to appeal this determination will run from the date of entry of this Decision and Order.

SO ORDERED.

Dated:    New York, New York                    _s/ *Robert E. Gerber*_
          December *11*, 2007              United States Bankruptcy Judge

---

[84]  The Court also grants Gabriel's request for reasonable fees, costs, or charges provided for under the agreements, to the extent Gabriel has not previously received them—a matter that, at least in concept, does not appear to be in dispute, and that, in any event, is something to which Gabriel has an entitlement.

-40-