UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X

URBAN COMMUNICATORS PCS LIMITED          08 Civ. 502
PARTNERSHIP, et al., Debtors,           08 Civ. 945
                                        08 Civ. 946
              Appellants,               08 Civ. 947 (RWS)

      -against-                          OPINION

GABRIEL CAPITAL, L.P.,

              Cross-Appellant.

--------------------------------------X

A P P E A R A N C E S:

      Attorneys for Appellants

      WINDELS MARX LANE & MITTENDORF, LLP
      156 West 56th Street
      New York, NY 10019
      By:  Charles E. Simpson, Esq.


      Attorneys for Appellee

      KASOWITZ, BENSON, TORRES
        & FRIEDMAN LLP
      1633 Broadway
      New York, NY 10019
      By:  David M. Friedman, Esq.
           Robert M. Novick, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9|12|08

**Sweet, D.J.**

Two appeals have been taken from the Decision and
Order on Gabriel Entitlement to Post-Petition Interest of
Honorable Robert E. Gerber, United States Bankruptcy Judge, so
ordered December 11, 2007 (the "Bankruptcy Court Order"): one by
debtors Urban Communicators PCS Limited Partnership ("UC-LP"),
Urban Comm-Mid-Atlantic, Inc. ("UC-MA") and debtors-in-
possession Urban Comm-North Carolina, Inc. ("UC-NC"),
(collectively, the "Debtors") and the other by Gabriel Capital
L.P., a creditor of all three debtors ("Gabriel"). The first
appeal, brought by the Debtors, challenges the Bankruptcy
Court's determination that Gabriel is a secured creditor, which
is affirmed. The second appeal, brought by Gabriel, challenges
the Bankruptcy Court's determination of the appropriate rate of
post-petition interest on Gabriel's claim, which is reversed.
Both appeals have proceeded together, having been filed on
January 18 and 29, 2008, respectively, and are related as will
be apparent.

**I. BACKGROUND**

In 1993, Congress passed § 309(j) of the Federal
Communications Act, which authorized the Federal Communications

1

Commission (the "FCC") institute a new auction process for licensing blocks of the communication spectrum. With respect to the Personal Communications Services ("PCS") spectrum, the FCC divided this spectrum into six (6) blocks, A through F, with "C-Block" licenses designated for small business participation. Successful bidders were permitted to finance their license acquisitions on an installment basis.

In May, 1996, UC-LP was the successful bidder for the right to apply to the FCC for licenses to operate ten "C Block" PCS licenses (the "Licenses"). UC-LP, with the FCC's consent and approval, assigned its rights as the successful bidder to UC-NC, a wholly-owned indirect subsidiary of UC-LP. UC-NC's corporate purpose was to finance the acquisition of, build and operate a digital PCS system in the geographical areas where UC-NC was granted PCS licenses.

Under the auction terms, UC-NC was required to post a purchase deposit with the FCC equal to ten percent of the successful bid for the Licenses. UC-NC financed the purchase deposit, borrowing $8,000,000 from Gabriel as evidenced by a Note Purchase Agreement ("Note Purchase Agreement"), pursuant to which UC-NC sold to Gabriel a 15% Senior Note due August 12, 1997, in the principal amount of $8,000,000.

On or about August 12, 1996, UC-LP and UC-MA each entered into agreements with Gabriel (the "Guaranty Agreements") pursuant to which UC-LP and UC-MA guaranteed the due and punctual performance of all of UC-NC's obligations to Gabriel under the Note Purchase Agreement and related documents.

Also on August 12, 1996, each of the Debtors and Gabriel entered into a Security Agreement (collectively, the "Security Agreements"), pursuant to which each of the Debtors granted Gabriel, as collateral for the payment of all indebtedness and obligations under the Note Purchase Agreement, first liens and security interests in all of their tangible and intangible personal property, including any proceeds from the sale of the Licenses. The Security Agreement for each of the Debtors provides, however, that "to the extent the Holding Company may be prohibited from granting a security interest in the FCC Licenses pursuant to the Communications Act or the rules and regulations of the FCC this security interest shall not encumber the FCC Licenses as opposed to the proceeds that may be derived therefrom."

On August 12, 1996, UC-LP and Gabriel entered into a Holding Pledge Agreement (the "Holding Pledge Agreement"),

3

through which UC-LP pledged, along with related property: (a) all of its right, title and interest in any equity interest in UC-MA, then existing or thereafter acquired; and (b) all of its right, title and interest to present and future payments and distributions relating to such pledged equity interest.

Additionally, on August 12, 1996, UC-MA and Gabriel entered into an Operating Pledge Agreement, under which UC-MA pledged, along with related property: (a) all of its right, title and interest in any equity interest in UC-NC, then existing or thereafter acquired; and (b) all of its right, title and interest to present and future payments and distributions relating to such pledged equity interests.

One year later, on August 12, 1997, the Debtors and Gabriel entered into an Amendatory Agreement, pursuant to which the Note Purchase Agreement was amended to provide that Gabriel would purchase from UC-NC an additional fifteen percent senior note due September 30, 1998, in the amount of $1,000,000 (the "New Note"), consolidated with the Senior Note, thereby increasing the aggregate principal amount of UC-NC's debt to Gabriel to $9 million. The Amendatory Agreement provides that the Senior Note and the New Note will bear interest in the amount of fifteen percent per annum in the absence of the

4

occurrence of any event of default. The Amendatory Agreement
further provides that in the event of a default, the principal
amount and overdue interest "shall bear interest at a rate per
annum equal to the rate of interest applicable to the note plus
four percent (4%)."

Gabriel filed separate UCC-1 Financing Statements with
the Secretaries of State of the States of Delaware and New York,
respectively, on August 15, 1997 (the "Financing Statements").
In each instance, the description of the collateral in the
Financing Statements provides in pertinent part: "to the extent
the Holding Company may be prohibited from granting a security
interest in the FCC Licenses pursuant to the Communications Act
or the rules and regulations of the FCC this security interest
shall not encumber the FCC Licenses as opposed to the proceeds
that may be derived therefrom."

In September, 1996, the FCC announced that UC-NC had
been conditionally granted the Licenses. On October 2, 1996,
UC-NC received from the FCC security agreements and a series of
promissory notes payable to the FCC (together, the "FCC Notes")
with a total face amount of $67.2 million in accordance with 47
C.F.R. § 24.711(b)(3). This $67.2 million obligation
represented the remaining ninety percent of the bid for the

Licenses after application of UC-NC's initial ten percent purchase deposit. The FCC Notes had a term of ten years and carried an interest rate of six and one-half percent per annum. On or about December 17, 1996, UC-NC executed the FCC Notes and the security agreements which granted the FCC a first lien on and continuing security interest in all of UC-NC's rights and interest in the Licenses.

On April 5, 1998, the FCC issued an order requiring all holders of "C and F Block" licenses to make their second interest payment to the FCC on or before October 29, 1998. The FCC's order provided that if a purchaser did not make the required interest payment, its licenses would be automatically cancelled.

On October 28, 1998, the day before its second installment payment on the Licenses was due, in an effort to stay the FCC's automatic cancellation of its Licenses under 47 C.F.R. § 1.2110(g)(4)(iv), UC-NC filed its petition instituting a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On October 29, 1998, the FCC automatically cancelled the Licenses and returned the spectrum subject thereto back to the public domain. On November 5, 1998,

UC-MA and UC-LP filed their petitions for relief under chapter 11.

On the date of filing its petition, UC-NC's assets consisted solely of its rights with respect to the Licenses.

On February 17, 1999, UC-NC commenced an adversary proceeding in the Bankruptcy Court against the FCC to (i) void the FCC's automatic cancellation of the Licenses and (ii) avoid, rescind or reduce UC-NC's debt obligations to the FCC to the fair market value of the Licenses at the time the FCC Notes were executed on December 17, 1996.

On June 1, 1999, Gabriel had filed a secured proof of claim in each of the individual chapter 11 cases of UC-NC, UC-MA and UC-LP in the amount of $10,739,766.00, plus interest. Paragraph 6 of the Attachment to each of the proofs of claim provides for treatment of Gabriel's claim as an unsecured claim to the extent that the collateral security given by the Debtors is insufficient to satisfy the secured claim.

The adversary proceeding was placed on hold pending the outcome of (i) a petition to the Supreme Court for a writ of certiorari to the Court of Appeals for the Second Circuit by

7

Nextwave Personal Communications, Inc. ("NextWave"), (ii) a petition to the Court of Appeals for the D.C. Circuit by Nextwave, UC-NC and others; (iii) a petition to the Supreme Court for a writ of certiorari to the D.C. Circuit by Nextwave; and (iv) upon issuance of the writ, the Supreme Court's decision in the Nextwave chapter 11 case.

In reliance on the Second Circuit's decision in the Nextwave case, and the Rules and Regulations of the FCC, the Wireless Telecommunications Bureau of the FCC issued a public notice on September 6, 2000 (the "Public Notice") announcing that an auction, to commence on December 12, 2000, would include the C and F Block Licenses previously held by UC-NC.

As a result of the FCC's announcement, on October 6, 2000, UC-NC filed a petition with the FCC for reconsideration of the Public Notice to re-auction UC-NC's Licenses as well as a notice of appeal and a petition for review and emergency stay with the Court of Appeals for the D.C. Circuit. On December 4, 2000, the D.C. Circuit dismissed the petition and stay motion as "incurably premature" in light of the reconsideration petition before the FCC, and denied mandamus relief. Based upon its cancellation of the Licenses under 47 C.F.R. § 1.2110, the FCC denied UC-NC's petition and proceeded to re-auction the

8

Licenses. The re-auction concluded on January 29, 2001, and the former UC-NC Licenses were auctioned by the FCC to new bidders.

On June 22, 2001, the D.C. Circuit reversed the FCC's Nextwave decision, Nextwave Personal Communications Inc. v. FCC, 254 F.3d 130 (D.C. Cir. 2001), and remanded, holding that "the Commission violated section 525 of the Bankruptcy Code in canceling Nextwave's licenses." The Court stated that "section 525 prevents the Commission, whatever its motive, from canceling the licenses of winning bidders who fail to make timely installment payments while in Chapter 11." UC-NC then filed a second Petition for a Writ of Mandamus with the D.C. Circuit. This Petition was also denied, but without prejudice to renewal after a decision by the Supreme Court in the Nextwave case. Urban Comm-North Carolina, Inc. v. FCC, No. 01-1490 (D.C. Cir. March 25, 2002). On January 27, 2003, the Supreme Court affirmed the D.C. Circuit's interpretation of Section 525 of the Bankruptcy Code. In FCC v. Nextwave Personal Communications, Inc., 537 U.S. 293 (2003) (the "Nextwave Decision"), the Court held that § 525 of the Bankruptcy Code prohibits the FCC from revoking or canceling a debtor's licenses upon the debtor's failure to make full and timely installment payments to the FCC, "and since § 525 circumscribes the Commission's permissible

9

action, the revocation of Nextwave's licenses is not in accordance with law." Id. at 839.

On September 25, 2003, the FCC issued an Order acknowledging that the FCC's "automatic cancellation rule was ineffective" and restored the Licenses to UC-NC.

On May 28, 1999, the FCC had filed a proof claim in the Bankruptcy Court against UC-NC, asserting a secured claim as of the Petition Date in the amount of $79,673,661 (the "Proof of Claim"), representing UC-NC's outstanding obligation to the FCC for ninety percent of the purchase price of the Licenses. The FCC asserted its right under 47 C.F.R. § 1.2110(g)(4)(iv) to receive full payment for the Licenses, including accrued interest.

UC-NC negotiated with SunCom Wireless, Inc., d/b/a Triton PCS, Inc. ("Suncom"), for sale of all the capital stock of UC-NC to SunCom, exclusive of certain Assigned Licenses and Disaggregated Licenses, for the purchase price of $113,000,000.

UC-NC also negotiated with Cellco Partnership d/b/a Verizon Wireless an asset sale of the Assigned Licenses and Disaggregated Licenses for the purchase price of $68,000,000,

10

subject to various terms and conditions, including as a condition precedent an agreement between UC-NC and the FCC and the FCC's regulatory approval of the transfer of the Assigned Licenses and Disaggregated Licenses to Verizon.

UC-NC and the FCC discussed various proposals for settlement of the FCC's claim, including tolling of interest for the period during which the Licenses were cancelled and the spectrum returned to the public domain. The FCC Settlement Agreement provided for, among other things, (i) a direct payment of \$49,937,276.86 to the FCC at the closing of the SunCom Sale, (ii) a direct payment to the FCC of \$43,676,775.09 at the closing of the Verizon Sale, for a total of \$93,614,051.95, plus, (iii) all interest accruing from and including January 1, 2005, through and including the dates of closing.

On March 15, 2005, the Debtors filed their application pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Rules") for an Order approving and authorizing the FCC Settlement Agreement. On March 17, 2005, Gabriel filed its Motion of Gabriel Capital L.P. to Compel Payment of Cash Collateral Pursuant to 11 U.S.C. §§ 362(d) and 363(e) (the "Cash Collateral Motion"), and on March 23, 2005, Gabriel filed an Objection to the Rule 9019 Motion.

11

On March 16, 2005, Gabriel filed amended proofs of
claim against each of the Debtors in the amount of
$11,134,451.33, "plus additional amounts per contract" (the
"Amended Proofs of Claim"). On March 23, 2005, UC-NC, UC-MA and
UC-LP filed their joint objection to Gabriel's Amended Proof of
Claim and the attachment thereto.

By an Order entered on the Bankruptcy Court's record
on January 24, 2005, and by written Order, dated March 24, 2005,
the Bankruptcy Court authorized and approved sale of the
Assigned Licenses and Disaggregated Licenses to Verizon, free
and clear of liens and encumbrances.

On April 4, 2005, the FCC Settlement Agreement was
approved by the Bankruptcy Court pursuant to Rule 9019.

On April 7, 2005, the Bankruptcy Court held a hearing
on the status of Gabriel's claim. Prior to that hearing,
counsel for the Debtors, Gabriel, the FCC, Verizon and SunCom
entered into an interim agreement resolving Gabriel's objection
to the Rule 9019 Motion and providing for an expedited hearing
on Gabriel's objection to the Cash Collateral Motion. The
parties agreed as follows:

- For purposes of the hearing, the Bankruptcy Court would presume that: (i) the Verizon Sale and the SunCom Sale would proceed toward closings and provide proceeds of $68.5 million and $113 million, respectively; (ii) the claims of the FCC were to be paid as set forth in sections 2 and 3 of the FCC Settlement Agreement; (iii) upon closing, the proceeds of sale from the Verizon and the SunCom transactions, net of payment to the FCC, would exceed the maximum amount asserted by Gabriel in the Gabriel Amended Proof of Claims.

- (i) The Gabriel claims were not less than $11,134,451.33 and the Debtors did not object to allowance of the Gabriel claim in that amount and (ii) the Debtors would not assert that the Debtors or their estates may recover from any property that may be found to secure Gabriel's claim, or from any amount that may otherwise be payable to Gabriel, any costs, expenses, or charges pursuant to 11 U.S.C. § 506(c).

UC-NC and Verizon received regulatory approval from the FCC for the sale of the Assigned Licenses and Disaggregated Licenses on June 2, 2005, and closed the transfer of the Assigned Licenses and Disaggregated Licenses on July 13, 2005.

UC-NC paid the FCC approximately $46,000,000 of its $93,614,051
secured claim against the Licenses. From the sale proceeds
remaining after the required payment to the FCC, approximately
$20 million was paid to Gabriel.

The SunCom sale ultimately failed to close. By an
agreement dated March 1, 2006, UC-NC sold other licenses to
Cricket License (Reauction) Inc.. Upon closing of this
transaction, the Debtors paid Gabriel an additional $1.8 million
on account of Gabriel's claim amount.

By order dated August 9, 2006, the Bankruptcy Court
approved terms for another sale by UC-NC to Verizon Wireless of
the remaining licenses held by the Debtors. The parties agree
that the cash proceeds of this second sale to Verizon Wireless,
together with the proceeds from the Debtors' earlier sales (all
after payment of the FCC's senior secured debt), exceed the
amount of the Gabriel claims, except when incorporating the
highest level of post-petition interest demanded by Gabriel.

**The Bankruptcy Court Order**

On March 17, 2005, Gabriel filed the Motion of Gabriel
Capital L.P. to Compel Payment of Cash Collateral Pursuant to 11

14

U.S.C. §§ 362(d) and 363(e) (the "Cash Collateral Motion"), by which Gabriel sought to compel the Debtors to distribute to Gabriel a portion of the proceeds of a license sale pursuant to sections 362(d) and 363(e) of the Bankruptcy Code.

On March 16, 2005, the Bankruptcy Court conducted a pre-motion conference (the "March 16th Conference") with Gabriel, the Debtors and the FCC to discuss the scheduling the Cash Collateral Motion relative to the Debtors' Federal Bankruptcy Rule 9019 motion to approve a settlement with the FCC (the "FCC Settlement") that was pending at the time. During the March 16th Conference, the Debtors contended that Gabriel is precluded from being treated as a secured creditor and entitled to no post-petition interest by reason of the FCC's ultimately ineffective attempt to cancel the FCC Licenses. On March 22, 2005, the Debtors filed their Opposition to the Motion of Gabriel Capital L.P. to Compel Payment Pursuant to 11 U.S.C. §§ 362(d) and 363(e) of the Bankruptcy Code.

On March 23, 2005, Gabriel filed an objection to the Debtors' application for an order approving the FCC Settlement Agreement.

To resolve Gabriel's objection, the Debtors and

Gabriel stipulated at a March 24, 2005 proceeding before the

Bankruptcy Court that: (i) Gabriel's claims are not less than

the Petition Date Claim Amount and the Debtors do not object to

allowance of Gabriel's claims in such amount; (ii) the Debtors

will not assert that the Debtors or their estates may recover

from any property that may be found to secure Gabriel's claim,

or from any amount that may otherwise be payable to Gabriel, any

costs, expenses, or charges pursuant to 11 U.S.C. § 506(c);

(iii) Gabriel's claims are not subject to any counterclaims,

defenses, offsets or subordination, except that the Debtors

contest whether Gabriel's claims are secured claims entitled to

post-petition interest and, in the event they are found to be

secured claims, the proper measure of interest; and (iv) the

Debtors would pay Gabriel the pre-petition claim amount together

with such interest that the Court may determine Gabriel is

entitled to from the License sale proceeds, subject to

disgorgement in the event the amount should be reduced on

appeal.

Additionally, the Bankruptcy Court scheduled an

expedited hearing on the issues of whether Gabriel's claims are

secured and, if so, whether Gabriel's post-petition interest

accrues at the default rate provided by the Financing

16

Agreements. Gabriel and the Debtors subsequently submitted a
series of briefs addressing these issues and participated in a
lengthy oral argument on April 7, 2005, (at which time the
Bankruptcy Court issued a bench decision that Gabriel's claim is
oversecured) and several brief additional colloquies over the
next two and a half years. On December 11, 2007, the Bankruptcy
Court issued the Bankruptcy Court Order.

In the Bankruptcy Court Order, the Bankruptcy Court
reaffirmed its earlier determination that Gabriel was a secured
creditor, and thus would have to be paid post-petition interest
before any excess value in the estates was distributed to equity
holders. See In re Urban Communicators PCS Ltd. P'ship, 379
B.R. 232, 235 n.2 (Bankr. S.D.N.Y. 2007). The Bankruptcy Court
also held that Gabriel was contractually entitled to default
interest at a rate of nineteen percent, compounding quarterly,
which, because of the length of delay, resulted in thirty-eight
percent simple interest equivalent. Id. at 235. However,
asserting its limited discretion to reduce an award in light of
the equities, the Bankruptcy Court ruled that Gabriel's award OF
post-petition interest should be capped at twenty-five percent
simple interest equivalent. Id. at 236.

17

The appeals from the Bankruptcy Court Order were heard and marked fully submitted on April 16, 2008.

## II.  STANDARD OF REVIEW

A district court accepts a bankruptcy court's findings of fact unless "clearly erroneous," and reviews its conclusions of law *de novo*. See In re Yohannes, 06 Civ. 461 (LTS), 2007 WL 2034301, at *2 (S.D.N.Y. July 17, 2007). Mixed questions of fact and law are subject to *de novo* review. In re Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003).

## III.  DISCUSSION

### A.  Gabriel's Claims Were Oversecured

Section 506(a) establishes the extent to which a claim is a secured claim. "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . ."  11 U.S.C. § 506(a)(1).

The general rule is that interest stops accruing when the bankruptcy petition is filed. See 11 U.S.C. § 502(b)(2). However, section 506(b) of the Bankruptcy Code provides that:

To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b). Interest becomes a part of the creditor's oversecured claim under section 506(b). Rake v. Wade, 508 U.S. 464, 471 (1993). Thus, to the extent that the Gabriel's claims were for less than the value of the collateral securing the claims, they are oversecured and Gabriel is entitled to post-petition interest.

The Debtors have not challenged the validity of the underlying pre-petition transaction, nor do they dispute that they granted Gabriel security interests in all of their assets other than the Licenses (but including proceeds from the Licenses). Debtors argue, rather, that Gabriel's claims were undersecured, at least for part of the relevant period, because (i) Gabriel had no security interest until the Licenses were in fact sold; (ii) upon the FCC's cancellation of the UC-NC's Licenses, UC-NC lost all rights with respect to the cancelled

19

Licenses, and because Gabriel's rights with respect to the

proceeds of the sale of the Licenses were derivative of UC-NC's,

Gabriel's claim on the proceeds from the sale of the Licenses

"vanished"; and (iii) for a substantial period of time, the

value of the Licenses was significantly less than the FCC's

claim secured thereby.  The Bankruptcy Court correctly rejected

all three arguments.

## *1.  Gabriel's Security Interest Attached When Granted*

Debtors argue that because Gabriel's security interest

was in the proceeds of the sale of the Licenses, and not the

Licenses themselves, Gabriel's security interest could only

attach when the Licenses yielded proceeds of sale.  Debtor Br.

23.  Therefore, argue Debtors, Gabriel has never been an

oversecured creditor because the value of its security interest

was zero until proceeds of the sale came into existence.  Id. at

24.

This argument was rejected by the Ninth Circuit in MLQ

Investors, L.P. v. Pac. Quadrasting, Inc., 146 F.3d 746 (9th

Cir. 1998).  In MLQ Investors, the Ninth Circuit followed In re

Ridgely Commc'ns., Inc., 139 B.R. 374 (Bankr. D. Md. 1992) and

In re Cheskey, 9 F.C.C.R. 986 (1994) in holding that a creditor

may perfect a security interest in a borrower's FCC broadcasting

license to the extent that the creditor seeks to protect its

interest in the proceeds of the borrower's license. MLQ

Investors, 146 F.3d at 748. The Ninth Circuit explained:

> [T]he FCC may prohibits security interests in
> licenses themselves because the creation of such
> an interest could result in foreclosure and
> transfer of the license without FCC approval.
> Such approval is necessary to regulate the
> airwaves in the public interest. No such public
> interest is implicated, however, by a security
> interest in the proceeds of a license, which does
> not grant the creditor any power or control over
> the license or the segment of the broadcast
> spectrum it represents.

Id. MLQ Investors thus adopted Ridgely's "'public/private'

distinction between a licensee's right to transfer its license

(a 'public' right between the FCC and the licensee which is

governed by the FCC) and the licensee's right to receive

remuneration for a transfer (a 'private' right between two

parties)." Id. This distinction has been generally adopted by

the other courts to address the issue. See, e.g., In re Beach

Television Partners, 38 F.3d 535 (11th Cir. 1994); In re Thomas

Commc'ns, Inc., 166 B.R. 846 (S.D.W. Va. 1994); State St. Bank

and Trust Co. v. Arrow Commc'ns, Inc., 833 F. Supp. 41 (D. Mass.

1993); In re PBR Commc'ns Sys., Inc., 172 B.R. 132 (Bankr. S.D.

Fla. 1994); cf. In the Matter of Tak Commc'ns, Inc., 985 F.2d

916 (7th Cir. 1993) (prior to Cheskey opinion, refusing to

recognize security interest in FCC license, but noting that

21

"[w]hether to permit such interests is . . . a matter for the FCC rather than the courts to decide").

The Ninth Circuit then addressed defendant's argument that "even if [the lender] had a security interest in the proceeds from the sale of the licenses, this interest did not arise, and therefore could not be perfected, until the licenses were sold." MLQ Investors, 146 F.3d at 749. Noting that government licenses, as a general rule, are considered to be "general intangibles" under the Universal Commercial Code and that here, the licensee's rights in the license proceeds including a limited right to pledge those proceeds as collateral, the Ninth Circuit stated:

> [W]e see no reason why the proceeds should not be considered 'general intangibles,' therefore subject to perfection prior to sale. Indeed, a contrary outcome would mean that the distinction between private and public interests in FCC license proceeds, outlined in In re Ridgely and In re Cheskey, would have no meaning and the private interests would be devoid of value. A security interest in proceeds that could not be perfected until after foreclosure and sale of the license would, in almost every circumstance, be primed by IRS liens and claims of other creditors. The fact that in the present case the actual dollar proceeds from the sale of the licenses were generated only after the sale . . . is immaterial.
>
> *   *   *
>
> A creditor may obtain a security interest in the proceeds of the sale of an FCC license, and such

22

an interest constitutes a 'general intangible'
that may be perfected prior to sale of the
license.

Id. See also In re Media Properties, Inc., 311 B.R. 244, 249-50
(Bankr. W.D. Wis. 2004). Debtors have failed to distinguish MLQ
Investors or present any contrary authority. It is therefore
held that Gabriel's security interest attached at the time it
was granted.

## *2. Gabriel's Security Interest Survived the FCC's Ineffective Cancellation of the Licenses*

Debtors next argue that whatever rights Gabriel had in
the Licenses were extinguished when the Licenses were cancelled
by the FCC. However, the Supreme Court has held that 11 U.S.C.
§ 525 prohibited the FCC from canceling the Licenses and that
the FCC's efforts to do so were contrary to law. See F.C.C. v.
NextWave Personal Communications Inc., 537 U.S. 293 (2002),
affirming Nextwave Personal Communications, Inc. v. F.C.C., 254
F.3d 130, 155 (D.C. Cir. 2001) ("[W]e think section 525 prevents
the Commission, whatever its motive, from canceling the licenses
of winning bidders who fail to make timely installment payments
while in Chapter 11."). As a result, the FCC acknowledged that
its cancellation was ineffective. See Debtors' Brief 12.

Debtors have failed to establish any basis for the contention that the FCC's cancellation, ineffective as to UC-NC's rights in the Licenses, was nevertheless effective as to Gabriel's perfected security interest. Debtors' reliance on In re Magnacom Wireless, LLC, 503 F.3d 984 (9th Cir. 2007) is misplaced. In Magnacom, as in the instant case, a holder of several FCC licenses was unable to make its installment payments to the FCC, and filed for relief under Chapter 11. Id. at 989. In Magnacom, however, the FCC was granted relief from the automatic stay in order to cancel the debtor's licenses, which it did. Id. The FCC then proceeded to auction new licenses for the same spectrum segments for a new ten-year term. Id.

Magnacom's chapter 7 trustee, unlike the Debtors here and the debtor in NextWave, did not challenge the FCC's cancellation of the licenses, did not seek relief based on 11 U.S.C. § 525, and did not seek to recover its licenses or set aside the transfer of new licenses. Id. at 991. The Ninth Circuit held that Magnacom's licenses had been lawfully cancelled, and that Magnacom had no right to proceeds from the FCC's later sale of new licenses for the same spectrum. Id. at 995.

24

Here, of course, the Licenses were not lawfully cancelled, and no-one is seeking proceeds from the sale of new licenses by the FCC. Magnacom is therefore inapposite.

### 3. *The Value of Collateral Is Determined at the Time of Its Disposition*

Debtors' final argument is based on the assertion that there was a substantial period of time during which the value of the Licenses was significantly less than the value of Gabriel's claims -- due, in part, to the FCC's attempt to cancel the Licenses. Debtors argue that during this period, Gabriel's claims were undersecured, and Gabriel is therefore not entitled to interest for its duration.

The value of the secured creditor's interest in the collateral securing its claim is to be determined "in light of the purpose of the valuation and the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1); Bankruptcy Court Order at 241.

Relying on Ford Motor Credit Co. v. Dobbins, 35 F.3d
860, 870 (4th Cir. 1994) and In re Alpine Group, 151 B.R. 931,
935-36 (B.A.P. 9th Cir. 1993), the Bankruptcy Court held that,
though section 506(a) is silent in prescribing a particular time
as of which a secured creditor's collateral is to be valued,
"where collateral was actually sold during the pendency of the
case (and where the terms of the sale were fair and arrived at
on an arm's-length basis), the actual sale price should be used
to measure the property's value, as contrasted to some 'earlier
hypothetical valuation.'" Id. (quoting Ford Motor Credit Co.,
35 F.3d at 870). See also In re Two "S" Corp., 875 F.2d 240,
243 (9th Cir. 1989) (evidence of appraised values irrelevant
because sale price is better indicated or value); In re Pan Am.
General Hosp., LLC, 385 B.R. 855, 864 (Bankr. W.D. Tex. 2008)
(noting that "there is virtually no debate regarding . . .
timing [of the valuation of collateral] when there has been a
court-ordered sale" and finding that creditor was oversecured
based on sale price of collateral at auction); In re Schreiber,
163 B.R. 327, 332-333 (Bankr. N.D. Ill. 1994) (valuing
collateral based on sale price); 4 Collier on Bankruptcy ¶
506.03[6][b] (rev. 15th ed. 2008) ("[I]f an actual sale . . . is
to occur, the value of the collateral should be based on the
consideration to be received by the estate in connection with
the sale, provided that the terms of the sale are fair and were

26

arrived at on an arm's-length basis."). This proposition in
consonant with the direction of Dewsnup v. Timm, 502 U.S. 410,
417 (1992), which stated that "[a]ny increase over the
judicially determined valuation during bankruptcy rightly
accrues to the benefit of the creditor, not to the benefit of
the debtor and not to the benefit of other unsecured creditors .
. . ."

          Debtors seek to distinguish the above cases based on
the assertion that UC-NC had no rights with regard to the
Licenses, and thus no ability to sell them, for the several
years prior to the FCC's recognition that its cancellation of
the Licenses was ineffective. Debtors argue that for at least
that period, Gabriel should not be granted post-petition
interest. Debtors fail to present any legal support for this
argument, but simply press that it would be unfair to assess
interest against Debtors for a period during which they did not
have control over the Licenses. The Bankruptcy Court
appropriately disposed of this argument:

     Gabriel had liens on more than the licenses
     themselves.    Gabriel also had liens on the
     proceeds of its earlier collateral; on Debtors'
     causes of action against the FCC; and on the
     capital stock of the Debtors' subsidiaries.
     During the period that the FCC unlawfully
     cancelled the Debtors' rights to the Licenses,
     the Debtors maintained litigation rights against
     the FCC for this wrongful cancellation, whose

value is now apparent. And Gabriel maintained
collateral rights to the proceeds of the
licenses. . . . To ignore Gabriel's other
species of collateral would be to deny Gabriel
that aspect of the benefit of its bargain, and
give the Debtors' junior creditors and equity a
windfall.

Bankruptcy Court Order at 244.

Gabriel's liens on the Debtors' general intangibles
encompassed not just the sale value of the Licenses, but also
any claims and causes of action possessed by the Debtors. See
UCC § 9-102(42). UC-NC's ultimate liquidation of the Licenses
demonstrated that the rights were worth over $140 million.

In addition, Gabriel has a claim against UC-MA, and
that claim is secured by UC-NC's stock. Gabriel remains an
oversecured creditor of UC-MA, irrespective of its interest in
the Licenses or the sale proceeds.

In the Appellants' Brief, the Debtors argue that "the
Debtor's estate that must be examined for purposes of Gabriel's
claim to post-petition interest is solely the UC-NC estate; the
holder of the Licenses" and ascribe error to the Bankruptcy
Court's consideration of UC-MA and UC-LP's property. Debtors'
Brief at 18-19. However, the Bankruptcy Court's assessment that
Gabriel has independent oversecured claims against each Debtor

was correct, because the cash sale proceeds must dividended upwards through the chain of solvent Debtors before it can reach UC-MA and its equity holders.

Gabriel is entitled to the benefit of the increase in its collateral during the ten years it has been waiting to be repaid. The Bankruptcy Court properly rejected the Debtors' unsupported arguments. There is no basis for reversing the Bankruptcy Court's holding that Gabriel's claims are over-secured and that Gabriel is therefore entitled to receive post-petition interest pursuant to 11 U.S.C. 506(b).

## B.     The Second Appeal

Having ruled that Gabriel is an oversecured creditor of UC-NC, the Bankruptcy Court determined that Gabriel is contractually entitled to post-petition interest at a default rate of nineteen percent, compounded quarterly. Bankruptcy Court Order at 248-49. The Bankruptcy Court then reduced the award of interest to a twenty-five percent simple interest equivalent (from thirty-eight percent) in order to compensate the Debtors for their efforts to protect their interests in the Licenses. Id. at 254-55. Gabriel has appealed the Bankruptcy Court Order to the extent that it reduced Gabriel's award of

29

post-petition interest beyond the point that all unsecured creditors were fully compensated, for the benefit of Debtors' equity.

In United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989), the Supreme Court held that § 506(b) of the Bankruptcy Code entitles a creditor to receive post-petition interest on an oversecured nonconsensual allowed claim. While the holding of Ron Pair does not bear directly on this case, which involves a consensual claim,[1] that decision did state, in dicta, that consensual and nonconsensual oversecured claims should be treated the same in allowing post-petition interest. Id. at 243.

Ron Pair does not address the issue of how post-petition interest should be calculated. However, "[t]he great majority of courts to have considered the issue since Ron Pair have concluded that post-petition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose -- the so-called 'contract rate' of interest." 4 Collier on Bankruptcy ¶ 506.04[2][b][I] (rev. 15th

---

[1] "There are two types of secured claims: (1) voluntary (or consensual) secured claims, each created by agreement between the debtor and the creditor and called a 'security interest' by the Cod, and (2) involuntary secured claims, such as a judicial or statutory lien, which are fixed by operation of law and do not require the consent of the debtor." Ron Pair, 489 U.S. at 240 (citations omitted).

30

ed. 2008) (collecting cases). The courts adopt a presumption in favor of applying a contractual default rate of interest, "subject to equitable considerations." In re Vanderveer Estates Holdings, Inc., 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002); In re Vest Assocs., 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998). See also In re Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994) ("What emerges from the post- Ron Pair decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations."). The general scope of the inquiry into "equitable considerations" has been nicely framed by In re P.G. Realty Co., 220 B.R. 773 (Bankr. E.D.N.Y. 1998):

> [W]here that power [to modify rights created by state law or private agreement is] not explicit – where it resides only in general language directing the Court to allow interest on an oversecured claim – the Court should be loathe to exercise it in the absence of compelling evidence that recognition of a right created by state statute or private agreement would do violence to the principles which constitute the foundation of bankruptcy law. Case law offers four examples of such situations: where there has been misconduct by the creditor, where application of the statutory interest rate would cause direct harm to the unsecured creditors, where the statutory interest rate is a penalty, or where its application would prevent the Debtor's fresh start.

Id. at 780. Here, the unsecured creditors will be fully compensated, and there have been no allegations of misconduct by Gabriel. UC-NC has liquidated its assets and will not be making

31

a "fresh start," irrespective of the interest rate applied to Gabriel's claims. The Bankruptcy Court made no findings that the contractual default interest rate was a penalty, and there are no facts to support that proposition. Rather, the Bankruptcy Court, relying on Vanston Bondholders Protective Comm. V. Green, 329 U.S. 156 (1946), asserted its equitable authority to depart from the contractual rate in order to protect the interests of Debtors' equity. Bankruptcy Court Opinion at 252-53. As discussed below, the Bankruptcy Court's reduction of the award of post-petition interest to benefit Debtors must be reversed in view of our Court of Appeals' authority.

In Vanston, the Supreme Court addressed the question of whether the first mortgagor of an insolvent debtor should be allowed its contractual post-petition interest on interest where the debtor's assets were sufficient to pay the first mortgage bondholders in full, including interest on interest, but if interest on interest were paid, subordinate creditors "would receive a greatly reduced share in the reorganized corporation." Vanston, 329 U.S. at 158. The subordinate creditors conceded that the first mortgage bondholders should receive simple interest on the principal due them, but challenged their right to be paid interest on interest. Id. The Court held that since

the district court had taken over the debtor's assets for the purpose of preserving them "pending a ratable distribution among all the creditors according to their interests as of the date the receivership began," it would have been contrary to that purpose and inequitable to the junior creditors to enrich the mortgage bondholders at the expense of the junior creditors due to default caused by the district court's stay order. Id. at 166.

Although Vanston addressed courts' equitable power to reduce an award of post-petition contractual interest to avoid prejudice to subordinate creditors in the case of an insolvent debtor, the Bankruptcy Court read it to sanction the courts' doing so in the interests of equity holders of a solvent debtor as well. The Bankruptcy Court relied on the following language from Vanston:

> It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditor and debtor . . . .

See Bankruptcy Court Opinion at 253, quoting Vanston, 329 U.S. at 165. The Bankruptcy Court reasoned that:

> Analysis of the balance of equities . . . "between creditor and creditor" calls for consideration of the effect of the secured creditor's interest demands on other creditors. Analysis of the balance of equities between

33

"creditors    and    the    debtor"    calls    for
consideration  of  the  effect  of  the  secured
creditor's interest demands on the debtor itself,
and, as Vanston Bondholders makes clear, is a
separate and also permissible inquiry.

Id.


        The Court of Appeals for the Second Circuit has

expressly rejected this reading of Vanston.    Ruskin v.

Griffiths, 269 F.2d 827 (2d Cir. 1959) held that "the Supreme

Court did not intend that the principle enunciated by it in

Vanston, in a contest between creditors, should be applied to a

contest between a debtor's creditor and its stockholders."  Id.

at 830.  Addressing the passage from Vanston relied upon by the

Bankruptcy Court (quoted above), which was similarly relied upon

by the District Court in that case, the Court of Appeals stated:

    It seems to us . . . that when this language is
    read in context it does not support the decision
    of  the  district  court.    It  follows  after  a
    discussion of two differing situations,

    "To allow a secured creditor interest where his
    security was worth less than the value of his
    debt was thought to be inequitable to unsecured
    creditors * * * But where an estate was ample to
    pay all creditors and to pay interest even after
    the petition was filed, equitable considerations
    were invoked to permit payment of this additional
    interest to the secured creditor rather than to
    the debtor" . . . .

    and refers only to that discussion.

34

Ruskin, 269 F.2d at 831, quoting Vanston, 329 U.S. at 165. The
Court of Appeals reasoned that

[s]ince the result the Court reached stemmed from
the equitable principles developed with respect
to the creditors' claims for simple interest in
bankruptcy and equity receivership proceedings,
and since it explicitly noted that these
principles favored the debtor's creditors over
its stockholders, the Court could hardly have
meant that the rule it was declaring was to be
applied in the case of a solvent debtor.

Id. The Court of Appeals also noted that its holding was

consistent with In re Int'l Hydro-Electric Sys., 101 F. Supp.

222 (D. Mass. 1951), which held that where debtor had sufficient

assets to meet all the claims of its creditors, and the burden

of post-petition contractual interest would therefore fall

entirely on the interest of stockholders, "[t]hey cannot

complain that they are treated inequitably when their interest

is cut down by the payment of a sum to which . . . debenture

holders are clearly entitled by the express provisions of the

trust indenture." Id. at 224.


        Likewise, here, it is not inequitable to cut down the

interest of Debtors' shareholders by interest payments at a

default rate to which Debtors contractually agreed. As Ruskin

notes:

A variable interest rate provision in the event
of a stated default . . . . can be beneficial to
a debtor in that it may enable him to obtain

35

money at a lower rate of interest than he could
otherwise obtain it, for if a creditor had to
anticipate a possible loss in the value of the
loan due to his debtor's bankruptcy or
reorganization, he would need to exact a higher
uniform interest rate for the full life of the
loan.

Ruskin, 269 F.2d at 832. Thus, the rule under Ruskin is that

when the debtor is solvent and there is a contractual provision,

valid under state law, providing for interest on unpaid

installments of interest, it is enforceable with respect to

installments due before and after the petition was filed. In re

White, 88 B.R. 498, 508 (Bankr. D. Mass. 1988). Debtors have

failed to address Ruskin, which remains good law. See, e.g., In

re 139-141 Owners Corp., 306 B.R. 763, 771-73 (Bankr. S.D.N.Y.

2004) ("Ruskin remains effective to date in the Second Circuit

and is recognized by other circuits.") (collecting cases), rev'd

in part, 313 B.R. 364 (S.D.N.Y. 2004) ("Ruskin remains the law

of the Second Circuit and applies to this case."). Debtors have

failed to cite any case in which a court has found an equitable

basis for reducing a lawful contractual interest rate prescribed

by a contract where a debtor was able to pay all of its

unsecured creditors.


The instant case does differ from Ruskin to the extent

that, in Ruskin, the allowance of interest on interest impaired

the interest of equity, but did not eliminate it completely,

36

whereas here, an award of full contractual interest for the post-petition period would not only eliminate the interest of Debtors' shareholders, but would also severely impair the recovery of subordinate creditors. However, Gabriel does not challenge the Bankruptcy Court's authority under Vanston to reduce the award of post-petition interest to the extent that it would prejudice other creditors. This Court agrees with Gabriel that, under Ruskin, it was appropriate for the Court to reduce the award of post-petition interest to the point that it would not prejudice subordinate creditors (i.e. solvency), but no further.

The Bankruptcy Court's decision rested in part on its determination that the instant case involves "unique circumstances":

> The Debtors, and all of their stakeholders, suffered first by the actions of the FCC—by regulatory action determined by the Supreme Court to have been unlawful. But it took lengthy litigation to obtain that determination. The Debtors took the many steps necessary to protect their interest in the licenses, in this Court and in proceedings elsewhere—ultimately securing the value of the licenses in a process running on since 1998, nine years ago. If the Debtors, bankrolled by Debtors' equity, had not continued that fight, Gabriel's collateral would be valueless, and Gabriel would have lost the entirety of its $9 million principal, along with all of the interest it now seeks to collect. Under Gabriel's argument, Gabriel would be the only beneficiary of that lengthy battle. . . .

Granting Gabriel an incremental recovery to
achieve an even higher return, with the effect of
simultaneously denying any and all recovery to
those who kept the fight alive, and whose efforts
bankrolled Gabriel's recovery, would be
unconscionable.

Bankruptcy Court Order at 255-56. It would indeed be unfair to

leave Debtors' equity uncompensated for bankrolling the efforts

that ultimately resulted in reversal of the FCC's cancellation

determination. However, there is no evidence in the record to

support the conclusion that Debtors' equity remains

uncompensated for any such efforts, and the Bankruptcy Court did

not hear evidence on the subject.

The existing record shows that equity holders did not

"bankroll" the efforts to overturn the FCC's determination, but

rather that such efforts were financed by a loan from Debtors'

Chairman, which has been repaid in full at fifteen percent

interest, with priority over Gabriel and all other creditors

other than the FCC, and with Gabriel's consent. Repayment of

this loan before the allowance of post-petition interest to

Gabriel is consistent with In re Alpine Group, discussed above,

in which the Bankruptcy Appellate Panel for the Ninth Circuit

Court of Appeals deducted from the sale price of collateral a

"credit for the costs of the improvements made by Alpine" for

the purposes of determining a creditor's secured status. 151
B.R. at 935.

Finally, Debtors argue that the Bankruptcy Court
determined that Gabriel's loan was usurious, and that Gabriel's
claim should therefore be disallowed under 11 U.S.C. § 502(b).
However, the record establishes the Debtor never argued below
that the loan was usurious or that the interest to which Gabriel
is entitled should be limited to twenty-five percent by reason
of the New York usury laws. The Bankruptcy Court sua sponte
utilized New York usury law as a "public policy benchmark" to
guide its equitable determination for the benefit of the
Debtor's shareholders, but did not hold that the loan was
usurious. See Bankruptcy Court Order at 254. In any event, the
loan does not violate New York usury laws because New York usury
laws do not apply to defaulted obligations. See Manfra,
Tordella & Brookes, Inc. v. Bunge, 794 F.2d 61, 63 n.3 (2d Cir.
1986) ("[T]he usury laws do not apply to defaulted
obligations."); Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,
310 F. Supp. 2d 556, 562 (S.D.N.Y. 2003) ("[I]t is well
established that the usury statutes do not apply to defaulted
obligations."); In re Integrated Res., Inc. Real Estate Ltd.
P'ship Sec. Litig., 851 F. Supp. 556, 565 (S.D.N.Y. 1994) ("Any
penalty interest rates or late fees assessed against the

Plaintiffs do not constitute usury, since New York's usury statutes do not apply to defaulted obligations."). This is because where interest has already fallen due, it becomes a debt which, like any other debt, may either be paid in cash or treated as a new loan to the debtor under an agreement that it shall bear interest. See Manfra, Tordella & Brookes, 794 F.2d at 63 n.3; Household Fin. Corp. v. Goldring, 33 N.Y.S.2d 514, 517-18 (App. Div. 1942), aff'd 43 N.E.2d 715 (1942).

The loan here provided for interest at the non-default rate of fifteen percent. The interest rate only increased to nineteen percent upon the occurrence of an event of default. As a matter of mathematics, the effect of compounding quarterly did not cause the simple interest equivalent to reach twenty-five percent until more than three years after the default. The Gabriel loan was not usurious, because there were no circumstances under which the interest rate could reach the statutory caps until years after a default.

**IV.  CONCLUSION**

The Debtors have failed to address the Second Circuit's decision in Ruskin. The Bankruptcy Court Order is therefore reversed with instructions to increase the award of

post-petition interest to Gabriel to the highest amount that

still permits UC-NC to repay its unsecured creditors in full.

It is so ordered.

**New York, N.Y.**
**September** $_{1.0}$ **, 2008**

**ROBERT W. SWEET**
**U.S.D.J.**